IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| IN RE PETITION OF ELLIOT CARLSON, | ) | No. 14 C 9244 |
| *et al.*, | ) | Chief Judge Castillo |
| | ) | |

**UNITED STATES' OPPOSITION TO PETITIONERS' MOTION FOR ORDER
DIRECTING RELEASE OF TRANSCRIPTS OF CERTAIN TESTIMONY FROM
AUGUST 1942 GRAND JURY INVESTIGATION OF THE *CHICAGO TRIBUNE***

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

ARGUMENT ........................................................................................................... 3

I.     No Statute or Rule Provides for Release of Grand Jury Information
For Reasons of Historical Interest ................................................................ 3

II.     Second Circuit Law Recognizing Historical Significance as a Special
Circumstance Justifying Disclosure Is Flawed and Contrary to the Weight
Of Supreme Court Jurisprudence ................................................................ 6

     A.     The Development of the Second Circuit's "Historical Significance"
Exception ...................................................................................... 6

     B.     The Supreme Court Has Never Endorsed a Non-Textual Exception
to Rule 6(e) and No Circuit Court post-*Carlisle* Has Embraced an
Exception Circumstances Exception to Disclosure .............................. 10

     C.     The Supreme Court Has Rejected the Use of Inherent Authority to
Circumvent the Plain Language of the Federal Rules ........................... 15

     D.     A Departure from the Plain Text to Create a Historical Interest
Exception Is Particularly Unjustified ...................................... 21

III.     The Supreme Court's Rulemaking Body Has Rejected an Amendment
To Rule 6(e) Based on Historical Interest .......................................... 24

CONCLUSION.......................................................................................................... 26

i

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

*Bank of Nova Scotia v. United States,*
487 U.S. 250 (1988) .................................................................................... 15, 16, 18

*Branzburg v. Hayes,*
408 U.S. 665 (1972) ................................................................................................ 3

*Caminetti v. United States,*
242 U.S. 470 (1917) ................................................................................................ 6

*Carlisle v. United States,*
517 U.S. 416 (1996) ...................................................................................... passim

*Craig v. United States,*
1997 WL 33773540   (C.A.2 Nov. 4, 1997) ......................................................... 18

*Douglas Oil Co. of California v. Petrol Stops Northwest,*
441 U.S. 211 (1979) ................................................................. 4, 16, 21, 23, 25

*Fund for Constitutional Gov't v. National Archives and Records Services,*
et al, 656 F.2d 856 (D.C. Cir. 1981) ..................................................................... 5

*Haldeman v. Sirica,*
501 F.2d 714 (D.C. Cir. 1974) ................................................................. 12, 13, 22

*In re American Historical Ass'n,*
49 F. Supp. 2d 274 (S.D.N.Y. 1999) ............................................................. 9, 18, 19

*In re Biaggi,*
478 F.2d 489 (2d Cir. 1973) ............................................................................. 6, 7

*In re Donovan,*
801 F.2d 409 (D.C. Cir. 1986)  ........................................................................... 15

*In re Grand Jury Subpoena, Judith Miller,*
493 F.3d 152 (D.C. Cir. 2007) ............................................................................ 11

*In re Hastings,*
735 F.2d at 1269 ................................................................................... 13, 19, 22

*In re Petition of Craig,*
131 F.3d 99 (2d Cir. 1997) .......................................................................... passim

*In re Petition of Kutler,*

ii

800 F. Supp. 2d 42 (D.D.C. 2011) ............................................................. 6, 11, 19

*In re Petition of Newman*
1988 WL 1094826 (Sept. 29, 1988)............................................................ 14

*In re Report and Recommendation,*
370 F. Supp. 1219 (D.D.C. 1974)............................................................... 12

*In re Special February, 1975 Grand Jury,*
662 F.2d 1232 (7th Cir.1981), ................................................................. 11

*Matter of Cash Currency Exch., Inc.,*
762 F.2d 542 (7th Cir. 1985) ..................................................................... 5

*Pittsburgh Plate Glass Co. v. United States,*
360 U.S. 895 (1959).......................................................................... passim

*Thomas v. Arn,*
474 U.S. 140 (1985)................................................................................ 17

*United States v. Baggot,*
463 U.S. 476 (1983).......................................................................... passim

*United States v. Hastings,*
461 U.S. 499 (1983)................................................................................ 17

*United States v. John Doe, Inc. I,*
481 U.S. 102 (1987)................................................................................ 16

*United States v. McDougal,*
559 F.3d 837 (8th Cir. 2009) .................................................................... 5

*United States v. Ron Pair Enterprises,*
489 U.S. 235 (1989).................................................................................. 6

*United States v. Sells Engineering,*
463 U.S. 418 (1983)......................................................................... 3, 4, 16

*United States v. Socony Vacuum Oil Co.,*
310 U.S. 150 (1940)................................................................................ 21

*United States v. Williams,*
504 U.S. 36 (1992).......................................................................... 15, 17, 18

**STATUTES**

15 U.S.C. §§ 6201-12 ................................................................ 21

18 U.S.C. § 3322 .................................................................... 21

28 U.S.C. § 331 ..................................................................... 24

1977, Pub. L. 95-78, 91 Stat. 319 ................................................. 17, 20

1984, Pub. L. 98-473, 98 Stat. 1837 .................................................. 21

2002, Pub. L. 107-56 § 203(a)(1), 115 Stat. 272 ...................................... 21

## FEDERAL RULE OF CRIMINAL PROCEDURE

Fed. R. Crim. P. 6 ................................................................... 21

Fed. R. Crim. P. 6(e) ........................................................... <u>passim</u>

Fed. R. Crim. P. 6(e)(2)(B) ........................................................... 4

Fed. R. Crim. P. 6(e)(2)(E) ........................................................... 5

Fed. R. Crim. P. 6(e)(3) ....................................................... 5, 13, 15

Fed. R. Crim. P. 6(e)(3)(A)-(D), (F)-(G) .............................................. 5

Fed. R. Crim. P. 6(e)(3)(A)(i) ...................................................... 23

Fed. R. Crim. P. 6(e)(3)(C)(i) ...................................................... 22

Fed. R. Crim. P. 6(e)(3)(E) .......................................................... 5

Fed. R. Crim. P. 6(e)(3)(E)(i) ...................................................... 21

Fed. R. Crim. P. 6(e)(3)(E)(ii) ..................................................... 24

Fed. R. Crim. P. 6(e)(C)(1) ..................................................... 10, 11

Fed. R. Crim. P. 16(a)(1)(B)(iii) ................................................... 23

Fed. R. Crim. P. 52 ................................................................. 16

**OTHER AUTHORITIES**

Federal Practice and Procedure § 106 (4th ed. 2013) ................................................................... 16

## INTRODUCTION

This petition presents an important legal issue of first impression in this circuit: whether a district court may reach outside the criminal federal rule governing grand jury secrecy in order to order the disclosure of grand jury records for the purpose of historical research. The Supreme Court seemingly answered this question when it held, unequivocally, that a court's inherent power "does not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure." *Carlisle v. United States*, 517 U.S. 416, 426 (1996). Nevertheless, the Second Circuit, based on decisions pre-dating *Carlisle* and its progeny, developed a body of case law favoring application of a judicially-created, nine-part test that would enable a district court to release grand jury information otherwise prohibited from release under Fed. R. Crim. P. 6(e). Several district courts have followed the Second Circuit's lead, but, post-*Carlisle*, the Second Circuit remains alone among circuit courts in endorsing a non-textual reading of Criminal Rule 6(e)'s disclosure provisions. The petitioners here now ask this Court to join the Second Circuit and to release grand jury information based on historical interest alone. Because such an atextual reading of Rule 6(e) is foreclosed by Supreme Court law, this Court should decline petitioners' invitation.

## BACKGROUND

Petitioner Elliott Carlson asserts that he is a former journalist and author researching a book about the investigation of Chicago Tribune reporter Stanley Johnston. *See generally* Declaration of Elliot Carlson, attached to the Petition at Exhibit A ("Carlson Decl."). Mr. Johnston was a war reporter for the *Tribune* in 1942, and was traveling back to California on the USS *Barnett*. Carlson Decl., ¶ 11. The *Barnett* was transporting the survivors from the USS *Lexington*, which had been destroyed at sea during the Battle of Coral Sea. *Id.* During the voyage, the *Barnett* received a coded message from Admiral Nimitz, Commander-in-Chief of the U.S. Pacific fleet, detailing the type and formations of approaching Japanese ships, and the timetable for an impending attack. *Id.*, ¶ 10. The subsequent battle was a significant victory for the U.S. Navy. *Id.*, ¶ 12. Soon after returning to port in San Diego, Johnston published an article in the *Tribune* entitled "Navy had Word of Jap Plan to Strike at Sea," containing details of Japanese ships that appeared to come from the decoded Nimitz message. *Id.*, ¶¶ 3, 14. Other newspapers, including the *New York News* and *Washington Times-Herald*, re-published the *Tribune* story. *Id.*, ¶ 16. An investigation ensued, but no indictments were returned. *Id.*, ¶¶ 15-18.

Petitioner correctly states that records regarding this incident and the investigation of Stanley Johnston reside at the National Archives and Records Administration ("NARA") and are open for public inspection. Although the grand jury interviews remain sealed, the open material includes a July 14, 1942 report from the Special Prosecutor, William D. Mitchell, recommending against prosecution. The report, attached hereto as Exhibit A, noted the following among the reasons why prosecution was not recommended:

I do not believe that a jury would convict Johnston merely for giving his June 7 article to the Managing Editor.   If we could show that Johnston, when he copied the document he found lying on his desk on the Barnett, knew it was a copy of a secret document that he had no right to see, we might make a case against him merely for disclosing its contents to his editor, but there is no proof that he knew or had reason to believe the document he found was in any sense "secret".   The fact that it was left lying around would indicate its lack of "secrecy" and admittedly he had heard the matter in the memorandum openly discussed in his presence by the officers on the Barnett …. If, as appears likely, some officer left a copy of that dispatch lying around, it may fairly be said there was as much carelessness on the ship as the Tribune was guilty of, and the Jury may think so.

See Exhibit A., REPORT ON CHICAGO TRIBUNE CASE, by William D. Mitchell, July 14, 1942.   The Assistant Attorney General, Wendell Berge, concurred in this recommendation, which he relayed in a Memorandum to the Attorney General.   *Id*.

## ARGUMENT

### I.      No Statute or Rule Provides for Release of Grand Jury Information for Reasons of Historical Interest.

The Supreme Court has repeatedly emphasized the critical role played by the federal grand jury.   The grand jury serves the "dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions."   *Branzburg v. Hayes,* 408 U.S. 665, 686-687 (1972) (footnote omitted).   *See generally, United States v. Sells Engineering*, 463 U.S. 418, 423-24 (1983).   The proper functioning of the grand jury system depends upon the secrecy of the proceedings.   As the Supreme Court has explained:

[I]f preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

- 3 -

*Douglas Oil Co. of California v. Petrol Stops Northwest,* 441 U.S. 211, 219 (1979) (footnotes and citation omitted); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399-400 (1959). Given the important purposes underlying grand jury secrecy, "[b]oth Congress and [the Supreme Court] have consistently stood ready to defend it against unwarranted intrusion. In the absence of *a clear indication in a statute or Rule*, we must always be reluctant to conclude that a breach of this secrecy has been authorized**.**" *Sells Engineering*, 463 U.S. at 425 (internal quotations omitted) (emphasis added).

In this case, there is no "statute or Rule," *id.*, that provides for unsealing the grand jury materials that the petitioner seeks. Federal Rule of Criminal Procedure 6(e) imposes a flat prohibition on disclosure by non-witness participants to grand-jury proceedings, "[u]nless these rules provide otherwise." Fed. R. Crim. P. 6(e)(2)(B). Rule 6(e) identifies only five discrete circumstances in which a district court may order disclosure:

> (E) The court may authorize disclosure — at a time, in a manner, and subject to any other conditions that it directs — of a grand-jury matter:
>
> > (i) preliminarily to or in connection with a judicial proceeding;
> >
> > (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury;
> >
> > (iii) at the request of the government, when sought by a foreign court or prosecutor for use in an official criminal investigation;
> >
> > (iv) at the request of the government if it shows that the matter may disclose a violation of state or Indian tribal criminal law, as long as the disclosure is to an appropriate state, subdivision, or Indian tribal official for the

- 4 -

> purpose of enforcing that law; or
>
> (v) at the request of the government if it shows
> that the matter may disclose a violation of
> military criminal law under the Uniform Code
> of Military Justice, as long as the
> disclosure is to an appropriate military
> official for the purpose of enforcing that
> law.

Rule 6(e)(3)(E).[1]  This list is not framed in open-ended terms. By its plain language, it defines the universe of circumstances in which a district court "may authorize disclosure . . . of a grand jury matter."  Fed. R. Crim. P. 6(e)(2)(E).  As petitioners concede, Petition at 4, n.3, none of these provisions permits petitioners access to the grand jury information they seek.

Nor should the court look beyond the text of Rule 6(e), as petitioners urge.  *See United States v. McDougal*, 559 F.3d 837 (8th Cir. 2009) (there is no common law right of access to grand jury materials and courts may not fashion a disclosure order in the absence of a recognized exception in Rule 6(e) (internal citations omitted)).  Rule 6(e) was enacted by Congress and has all the force and effect of a statute.  *See Fund for Constitutional Gov't v. National Archives and Records Services, et al*, 656 F.2d 856, 867 (D.C. Cir. 1981) (reviewing legislative history of Rule 6(e)).  There is no ambiguity with respect to Rule 6(e)'s exceptions to secrecy.  Rule 6(e)(3) does not contain the word "including" before the list of exceptions, and it contains no language indicating that the list of exceptions was merely illustrative or subject to expansion in the court's discretion.  *Matter of Cash Currency Exch., Inc.*, 762 F.2d 542, 552 (7th Cir. 1985) ("The general rule of statutory construction is that the enumeration of specific exclusions from the operation of a

---

[1]  The remaining provisions of Rule 6(e)(3) describe the circumstances in which prosecutors may disclose grand jury material without need for court approval (for example, to other government attorneys) and the procedures by which petitions for disclosure shall be filed. *See* Fed. R. Crim. P. 6(e)(3)(A)-(D), (F)-(G).

statute is an indication that the statute should apply to all cases not specifically excluded. *Expressio unius est exclusio alterius.*").

Where, as here, the language of a statute is plain and unambiguous, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enterprises*, 489 U.S. 235, 241 (1989), quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917). Accordingly, because there exists no statutory authority for disclosing grand jury material based solely on historical interest, the petitioners' request must be denied.

**II.    Second Circuit Law Recognizing Historical Significance as a Special Circumstance Justifying Disclosure Is Flawed and Contrary to the Weight of Supreme Court Jurisprudence**

Petitioners urge the court to exercise its "inherent authority" to release the grand jury material, reciting the multi-factor test developed by the Second Circuit and applied by the district court in *In re Petition of Kutler*, 800 F. Supp. 2d 42 (D.D.C. 2011). Petition at 7. The Second Circuit erred, however, in concluding that historical significance is an exceptional circumstance that may justify departure from the plain language of Rule 6(e). Moreover, to the extent that its reasoning had any force prior to the Supreme Court's decision in *Carlisle*, the principles articulated in that case and other Supreme Court cases limiting inherent authority leave no room for the Second Circuit's exceptional circumstances doctrine.

**A.    The Development of the Second Circuit's "Historical Significance" Exception**

The Second Circuit first recognized a non-textual exception to the rule of grand jury secrecy in *In re Biaggi*, 478 F.2d 489 (2d Cir. 1973). That case involved an appeal from a district court order granting the motion of the U.S. Attorney for the Southern District of New York to disclose the grand jury testimony of Mario Biaggi, then a member of the House of Representatives and a candidate in the Democratic primary for mayor of New York City. *See* 478 F.2d at 490.

The U.S. Attorney's motion was occasioned by Biaggi's public statements about what he had said (and not said) in the grand jury, and his own urging that his testimony be released.   *See id.* Despite not contesting the release of his testimony in general, Biaggi ultimately appealed the district court's disclosure order because he objected to the portion of the order directing that the materials be "redacted so as not to reveal the names of other persons or businesses mentioned therein." *Id.*   Biaggi asserted that such redactions would lead "to endless speculation about the blanked out names, and would perhaps involve him in libel suits were he to reveal such names himself."   *See id.* at 490-91.

In assessing the appropriateness of the district court's order directing disclosure of Biaggi's grand jury testimony, the Second Circuit began its analysis by noting that none of the exceptions codified in Rule 6(e) was applicable.   *See id.* at 492.   Moreover, commenting on the public intrigue surrounding the matter, the Court observed that, "[n]o matter how much, or how legitimately, the public may want to know whether a candidate for high public office has invoked the privilege against self-incrimination before a grand jury, or has lied about having done so, that interest must generally yield to the larger one of preserving the salutary rule embodied in Rule 6(e)." *Id.* at 493.

Nevertheless, the Second Circuit affirmed the district court's decision, holding that Rule 6(e) does not impose an absolute limit on a district court's exercise of its "sound discretion," and that grand jury materials may be released outside the specific confines of Rule 6(e) when "the special circumstances" of the case warrant.   *Id.* at 494.   The Court found that "special circumstances" were present, given that both Biaggi and the government had waived any protections and benefits owing under Rule 6(e) by requesting disclosure to address an issue of significant public importance, and that "the interests of the grand jurors [would] not be affected"

- 7 -

because "they asked no questions and their names could be redacted if they had." *Id.* Finally, the

Court noted that the privacy interests of those individuals mentioned in Biaggi's testimony could

be accommodated through redaction, which the district court had ordered. *See id.*

Years later, the Second Circuit extended *In re Biaggi* to find that historical significance,

standing alone, may constitute an exceptional circumstance of the sort recognized by the court in

*Biaggi. See In re Petition of Craig*, 131 F.3d 99 (2d Cir. 1997). In *Craig*, the district court

denied the petition of Bruce Craig, then a doctoral candidate at American University, for an order

directing the release of grand jury records pertaining to Harry Dexter White, a former Assistant

Secretary of the Treasury who had been accused of being a Communist spy. *See* 942 F. Supp.

881, 882 (S.D.N.Y. 1996). Although the petitioner conceded that none of the exceptions to grand

jury secrecy applied, he argued that the significant historical and public interest in the grand jury

records justified their disclosure pursuant to the court's "inherent supervisory authority" over

grand juries. *Id.* at 882. The district court disagreed, distinguishing prior cases in which

historians had been granted access to grand jury records regarding accused Soviet spies, and noting

that "if courts granted disclosure whenever the public had an interest in grand jury proceedings,

Rule 6(e) would be eviscerated." *Id.* at 883.[2]

The Second Circuit affirmed the district's court's holding denying the petition.

Nevertheless, in so doing, it reiterated and expounded upon the *Biaggi* "special circumstances"

rationale. *See* 131 F.3d at 101-04. The Second Circuit concluded that the disclosure of grand

jury materials pursuant to the "special circumstances" exception was consistent with the broad

---

[2] For example, the district court noted that, although " the court granted a scholar's request to disclose the grand jury testimony of a public official accused of being a Communist spy," in *In re Petition of May*, No. M 11-189 (S.D.N.Y. Jan. 20, 1987) (unpublished), "it did so only because the conduct of the grand jury had been the subject of litigation, and there had already been extensive prior disclosure of the grand jury proceedings." *In re Craig*, 942 F. Supp. at 883 (internal quotation marks omitted).

discretion vested in courts regarding matters of grand jury secrecy, and that Rule 6(e) was not a straightjacket on the exercise of such discretion. *See id.* at 102. Although cautioning that disclosure under the "special circumstances" exception is warranted only if the movant satisfies a "burden . . . *greater*" than the "particularized need" standard governing requests pursuant to one of Rule 6(e)'s enumerated exceptions, *see id.* at 104-06 & n.10 (emphasis added), the Second Circuit held that, in an appropriate case, "historical or public interest alone could justify the release of grand jury information." *Id.* at 105.

The *Craig* Court then created a non-exhaustive list of factors "that a trial court may consider when confronted with these highly discretionary and fact-sensitive 'special circumstances' motions." Those factors include:

> (i) the identity of the party seeking disclosure; (ii) whether the defendant to the grand jury proceeding or the government opposes the disclosure; (iii) why disclosure is being sought in the particular case; (iv) what specific information is being sought for disclosure; (v) how long ago the grand jury proceedings took place; (vi) the current status of the principals of the grand jury proceeding and that of their families; (vii) the extent to which the desired material — either permissibly or impermissibly — has been previously made public; (viii) whether witnesses to the grand jury proceedings who might be affected by disclosure are still alive; and (ix) the additional need for maintaining secrecy in the particular case in question.

*Id.* at 106. Elaborating on these factors, the Court observed that both the identity of the requestor and the position of the government should be accorded "great weight." *See id.* at 106.

In *In re American Historical Ass'n*, 49 F. Supp. 2d 274 (S.D.N.Y. 1999), the district court applied the holding of *In re Craig* in connection with grand jury records relating to the prosecution of Alger Hiss. *See* 49 F. Supp. 2d at 277-78. Although petitioners admitted that their request was not rooted in any exception to grand jury secrecy enumerated in Rule 6(e), they argued that the manifest historical importance of the materials justified disclosure. *Id.* at 283. Over the government's objection that there was no "historical interest" exception to the secrecy

requirements in Rule 6(e), the district court noted that it was "bound by *Craig*'s holding," and it ordered the documents released. To date, the Second Circuit is the only court of appeals to find that historical interest alone may be sufficient reason to depart from the plain language of Rule 6(e).[3]

### B. The Supreme Court Has Never Endorsed a Non-Textual Exception to Rule 6(e) and No Circuit Court post-*Carlisle* Has Embraced a Historical Interest Exception to Disclosure

The Supreme Court, in a case originating from this circuit, made clear that subsection 6(e)(C)(1) ("preliminarily to or in connection with a judicial proceeding") is "an affirmative limitation on the availability of court-ordered disclosure of grand jury materials." *United States v. Baggot,* 463 U.S. 476, 479 (1983). In that case, the district court permitted the release of records from a grand jury investigation related to commodity futures transactions for use in an audit to determine civil tax liability. Recognizing that the disclosure was not "preliminarily to or in connection with a judicial proceeding" under Rule 6(e), the district court nevertheless permitted disclosure under its "general supervisory powers over the grand jury." The Seventh Circuit reversed, holding that the information sought did not fall within Rule 6(e)'s exceptions. In *dicta,* however, the court noted that, "we may not always be bound by a strict and literal interpretation of Rule 6(e)," *In re Special February, 1975 Grand Jury,* 662 F.2d 1232, 1236-37 (7th Cir.1981), *aff'd sub nom United States v. Baggot* 463 U.S. 476 (1983). The Supreme Court affirmed without

---

[3] A number of district courts have followed the lead of the Second Circuit. Another New York judge subsequently granted a petition to unseal grand jury minutes and transcripts relating to the indictments of Julius and Ethel Rosenberg, Abraham Brothman and Miriam Moskowitz. *In re Petition of National Security Archive, et al.*, 08-cv-6599 (S.D.N.Y.) (Summary Order, Aug. 26, 2008). That case has been recently re-opened to seek addition witness testimony. In addition to the D.C. district court in the *Kutler* case, involving President Nixon's grand jury testimony, at least one district court in the Middle District of Tennessee, citing the Second Circuit, has also permitted the disclosure of grand jury information for reasons of historical interest. *In re Petition of Tabac*, No. 3:08-mc-0243, 2009 WL 5213717 (M.D. Tenn. Apr. 14, 2009) (ordering disclosure of grand jury minutes relating to Jimmy Hoffa).

comment, much less approbation, of the circuit court's *dicta*. To the contrary, the Supreme Court emphasized that Rule 6(e)(C)(1) was an "*affirmative limitation*" on the release of grand jury information. *Baggot*, 463 at 479 (emphasis added). As the Supreme Court noted, Rule 6(e) "reflects a judgment that not every beneficial purpose, or even every valid governmental purpose, is an appropriate reason for breaching grand jury secrecy." *Id*. at 480.

No other Supreme Court or circuit court case supports petitioners' position. The district court in *Kutler* relied on two cases from the D.C. Circuit to support its conclusion that it could depart from the strictures of Rule 6(e). Those cases are not on point. Like the Supreme Court, the D.C. Circuit has never embraced a non-textual exception to Rule 6(e) based on historical significance. *See In re Petition of Kutler*, 800 F. Supp. 2d at 47 (discussing cases).

In *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152 (D.C. Cir. 2007) ("*Miller*"), for example, after the conclusion of the trial of I. Lewis "Scooter" Libby, Dow Jones sought to unseal affidavits and portions of a court opinion that contained grand jury material relating to the investigation into the leak of Valerie Plame's identity. Dow Jones argued that witnesses had widely discussed their grand jury testimony, and that there was "an undeniable and overwhelming public interest in full public disclosure" so as to learn what justified the issuance of subpoenas to reporters Judith Miller and Matthew Cooper. *Miller*, 493 F.3d at 153. The government opposed unsealing any portion of the redacted material that was not disclosed at trial. The D.C. Circuit held that, insofar as the materials contained still-secret grand jury matters, they "must remain sealed." It went on to say, however, that "when once-secret grand jury material becomes 'sufficiently widely known' it may 'los[e] its character as Rule 6(e) material.'" *Id.* at 154 (internal citations omitted). The court then found that witnesses Armitage, Novak, Cooper and Rove had spoken widely and publicly about their testimony, and thus granted Dow Jones' motion to the

extent the redacted material had already been made public.  *Id.* at 154-55.   The D.C. Circuit, therefore, did not release grand jury testimony pursuant to any exception to grand jury secrecy, express or otherwise, and did not rely on any inherent authority to do so.   Instead, it found that certain information was no longer secret and thus was no longer covered by Rule 6(e).

Neither does *Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974) (*en banc*) support reliance on inherent authority to look outside the contours of Rule 6(e).   In *Haldeman*, one of the Watergate grand juries voted to provide a sealed report to the House Judiciary Committee because the report, in its view, would bear upon the Committee's consideration of possible articles of impeachment.   The district judge agreed.   Although citing *Biaggi* with approval and noting that "Rule 6(e), which was not intended to create new law, remains subject to the law or traditional policies that gave it birth," the Court emphasized that the disclosure at issue was not to the public, but was instead merely to the Judiciary Committee, which "in this setting acts simply as another grand jury." *In re Report and Recommendation,* 370 F. Supp. 1219, 1229-30 (D.D.C. 1974). Former Nixon aides who had been indicted then sought to enjoin the district court from turning over the report.   The *en banc* D.C. Circuit affirmed the decision of the district court and declined to issue extraordinary writs to enjoin the district judge.

*Haldeman* offers no support for the disclosure petitioner seeks here.   First, with respect to Rule 6(e), although the Court of Appeals affirmed, it expressed only "general agreement" with the district court's handling of the matter, and did not address specifically the district court's inherent authority analysis.   *Haldeman*, 501 F.2d 714, 715 (1974).   That is particularly significant because, at oral argument in the court of appeals, the prosecutor represented that the disclosure was being made *pursuant* to Rule 6(e), "preliminarily to or in connection with a judicial proceeding," *i.e.*, possible articles of impeachment and trial by the House of the Representatives.   *Haldeman*,

- 12 -

501 F.2d at 717 (D.C. Cir. 1974) (MacKinnon, J., concurring in part). That argument presented a justification for the district court's activity that was tied to the rule, rather than the "inherent authority" of the district court, and that was, moreover, consistent with Judge Sirica's own observations about the nature of the Judiciary Committee's functions with respect to Watergate. Second, *Haldeman* predated the Supreme Court's recent jurisprudence on inherent authority. It is thus not indicative of a general acceptance by the D.C. Circuit of non-textual exceptions to Rule 6(e). Third, no claim of "historical interest" was at issue in *Haldeman*, and the case thus offers no support at all for the historical interest exception that petitioners ask this Court to apply.[4]

The one D.C. Circuit decision to present a nearly identical fact pattern to that presented here resulted in an unpublished decision affirming the district court's refusal to create an historical significance exception to Rule 6(e). *See In re Petition of Newman*, No. 87-5345 (D.C. Cir. Apr. 20, 1995 (Attached as Exhibit B). That case involved a request by Public Citizen on behalf of University of Pittsburgh Professor Robert P. Newman to unseal the grand jury transcripts of Owen

---

[4] Only one other circuit – also pre-*Carlisle* and in the context of impeachment proceedings – has departed from the strictures of Rule 6(e) based on "exceptional circumstances." *See In re Petition to Inspect and Copy Grand Jury Materials (In re Hastings)*, 735 F.2d 1261 (11th Cir. 1984); *see also United States v. Aisenberg*, 358 F.3d 1327, 1350 (11th Cir. 2004) (noting holding of *In re Hastings* but not examining its viability in light of *Carlisle* as unnecessary to its decision). *In re Hastings*, however, is entitled to little weight for reasons explained below, at II.C. *See In re Special Grand Jury 89-2*, 450 F.3d 1159, 1178 (10th Cir. 2006) (citing cases and noting that Supreme Court has not endorsed the inherent authority theory); *United States v. Velez*, 344 F. Supp. 2d 329, 330 (D. P.R.2004) ("The First Circuit has never held that courts have the authority to order disclosure of grand jury materials in situations that do not fall within any of the exceptions contained in Rule 6(e)(3), and there is a strong presumption against courts exercising such authority"); *In the Matter of Electronic Surveillance,* 596 F. Supp. 991, 1001 (E.D. Mich.) ("In light of *Baggot*, the Eleventh Circuit's reliance on the inherent powers doctrine is suspect."), *abrogated on other grds*, *In re Grand Jury* 89-4-72, 932 F.2d 481 (6th Cir. 1991). Although petitioners claim that *In re Grand Jury Proceedings*, 417 F.3d 18, 26 (1st Cir. 2005) supports an extraordinary circumstances exception, *see* Petition at 5, that case did not address a petition for disclosure. Rather, the court determined that it could impose a secrecy order on a witness in addition to the restrictions normally imposed by Rule 6(e). Thus, the court in that particular case sought to enhance and protect grand jury secrecy rather than to erode it.

- 13 -

Lattimore.   Lattimore was a prominent China scholar alleged during the McCarthy era to be
sympathetic to Communists.   He was subjected to Senate hearings and prosecuted for perjury
allegedly committed during his congressional testimony.   Ultimately, the government dismissed
the bulk of the indictment.

Professor Newman, who was writing a biography about Lattimore, alleged that he was
"hindered in his work by the unavailability of the transcripts of the grand jury proceedings that led
to Lattimore's indictments."   *In re Petition of Newman*, Petition for Writ of Certiorari, No.
88-548, 1988 WL 1094826 (Sept. 29, 1988).   *Compare* Carlson Decl., Exh. A ("I'm a retired
journalist who has turned a long-standing interest in naval history into writing books about it . . . .
Crucial to this project will be my access to the testimony of the witnesses who testified before the
Grand Jury . . . .").   Newman's petition, like petitioners here, urged the district court to unseal the
grand jury transcripts based on the court's "inherent authority" to supervise grand juries, the age of
the case, and the public interest in both the case itself and what it revealed about an earlier era.
Newman, like petitioners here, also submitted detailed declarations attesting to the historical
importance of the information, the lack of any need for continued secrecy, and the fact that most of
the individuals involved were no longer alive.   The government opposed the petition, the district
court denied it without opinion, and Newman appealed to the D.C. Circuit.

The D. C. Circuit summarily affirmed.   Although the opinion is unpublished and thus
lacks precedential value, *see* D.C. Circuit Rule 32.1(b)(1)(A), then-Judge Ginsburg's reasoning is
instructive:

> Professor Newman seeks the Lattimore transcripts for historical purposes, solely to
> reveal what transpired during those grand jury proceedings.   There is no claim that
> disclosure is sought in connection with any judicial proceeding or other category of
> circumstances delineated in Rule 6(e)(3).   Those categories are so circumscribed
> because of the legitimate concern about "the possible effect upon the functioning of
> future grand juries of unduly liberal disclosure."   *In re Donovan* , 801 F.2d 409,

- 14 -

410 (D.C. Cir. 1986) (per curiam). Since a claim of historical importance, without more, falls outside the scope of the Rule 6(e)(3) exceptions permitting disclosure, the district court's denial of Professor Newman's petition to unseal the Lattimore grand jury transcripts was appropriate.

*Newman* at p. 2.

### C. The Supreme Court Has Rejected the Use of Inherent Authority to Circumvent the Plain Language of the Federal Rules

Although it came close in *Baggot*, the Supreme Court has not yet squarely addressed whether a district court's authority to disclose grand jury materials is cabined by Rule 6(e). Nevertheless, the Supreme Court has made clear, subsequent to *In re Biaggi,* that (1) neither "inherent supervisory power" nor policy considerations provide a basis to circumvent or contravene the specific language of the Federal Rules of Criminal Procedure. *Carlisle v. United States,* 517 U.S. at 426-28; *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254-55 (1988); and (2) district courts have little supervisory power over grand juries. *United States v. Williams,* 504 U.S. 36, 46-47 (1992). *See also Baggot*, 463 U.S. at 477 ("The provision in (C)(i) that disclosure may be made 'preliminarily to or in connection with a judicial proceeding' is, on its face, an affirmative limitation on the availability of court-ordered disclosure of grand jury materials"); 1 Charles A. Wright and Andrew D. Leipold, Federal Practice and Procedure § 106 (4th ed. 2013) ("The Supreme Court has suggested that there is no authority beyond what is granted by Rule 6, and has made it clear that courts have no sweeping supervisory power over grand juries.").

In the years immediately following the passage of Rule 6(e), the Supreme Court indicated that disclosures of grand jury material must come within one of the enumerated statutory exceptions. In an antitrust conspiracy case, for example, the Court upheld the trial court's refusal to allow a defendant to inspect the grand jury minutes of a government witness. In so holding, the Court stated that, "[p]etitioners concede, as they must, that any disclosure of grand jury minutes is

covered by Fed. Rules Crim. Proc. 6(e) promulgated by this Court in 1946 after the approval of Congress." *Pittsburgh Plate Glass Co.,* 360 U.S. 395, 398-99 (1959). The Court went on to explain that, within the enumerated exceptions to grand jury secrecy, trial judges may exercise their discretion to release grand jury information, so long as the defendant shows a "particularized need" for the information that outweighs the policy of secrecy. *Id.* at 400; *Douglas Oil,* 441 U.S. at 222 (articulating standard for obtaining court-ordered release of grand jury transcripts "under Rule 6(e)"); *Sells Engineering,* 463 U.S. at 443 (same); *see also Baggot, supra.*

A court's exercise of discretion – within the confines of Rule 6(e) – to determine whether a petitioner has established a particularized need for grand jury information, does not translate into the power to exercise "inherent supervisory authority" to circumvent entirely the strictures of a Federal Criminal Rule. *In Bank of Nova Scotia,* 487 U.S. 250 (1988), the Supreme Court held that a court may not invoke its supervisory power to circumvent the harmless error standard of Federal Criminal Rule 52(a). Indeed, "federal courts have no more discretion to disregard the Rule's mandate than they do to disregard constitutional or statutory provisions." *Bank of Nova Scotia,* 487 U.S. at 254-55; *accord United States v. John Doe, Inc. I,* 481 U.S. 102, 109-110 (1987) (the plain language of rules may not be ignored in favor of policy arguments). Federal Rule of Criminal Procedure 52, the Court found, was "in every pertinent respect, as binding as any statute duly enacted by Congress." *Id.* at 255.

Similarly, in *Carlisle,* the Supreme Court considered the question of whether a trial judge could grant, pursuant to its inherent authority, an untimely Rule 29 motion for acquittal or, alternatively, *sua sponte* enter a judgment of acquittal. Although *Carlisle* recognized that courts may, "within limits, formulate procedural rules *not* specifically required by the Constitution or Congress," *Carlisle,* 517 U.S. at 426, quoting *United States v. Hastings,* 461 U.S. 499, 505 (1983)

- 16 -

(emphasis added), it added that courts may not exercise their supervisory powers in such a way as to conflict with a federal statute or rule. *Id.* Moreover, the Supreme Court has severely circumscribed the authority of courts to rely on their supervisory powers at all in the context of grand juries. "*Hastings* and the cases that rely upon the principle it expresses deal strictly with the courts' power to control their *own* procedures." *United States v. Williams*, 504 U.S. 36, 45-46 (1992) (emphasis in original). "Because the "grand jury is an institution separate from the courts, over whose functioning the courts do not preside, . . . no such 'supervisory' judicial authority exists." *Williams*, 504 U.S. at 47.

Regardless of the precise scope of a trial court's inherent authority, the Supreme Court in *Carlisle* was unwaveringly clear: Inherent power "*does not* include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure." *Carlisle*, 517 U.S. at 426 (emphasis added). Thus, when the trial court in *Carlisle* either *sua sponte* entered a judgment of acquittal or granted an untimely motion for acquittal, it contradicted and "effectively annulled" Rule 29(c)'s seven-day filing limit. Similarly, an order permitting disclosure of grand jury material for reasons outside Rule 6(e) would effectively annul the statutory provisions limiting when the disclosure of grand jury information may occur. This is particularly apparent with respect to Rule 6(e), which in relevant part was enacted directly by Congress. Pub. L. No. 95-78, § 2(a), 91 Stat. 319 (1977). The Supreme Court has made clear that a court's inherent authority does not extend that far. *See also Thomas v. Arn*, 474 U.S. 140, 148 (1985) (even a "sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions.").

The courts that have condoned the release of grand jury information for reasons of historical significance have either failed to account for, or given insufficient weight to, the *Carlisle*

line of cases.   The *Craig* decision, for example, in which the Second Circuit first announced that historical significance could alone constitute an extraordinary circumstance sufficient to disregard Rule 6(e), ignored *Carlisle*, *Bank of Nova Scotia, and Williams* entirely, despite the fact that those cases were discussed at length in the government's briefing.   *Compare Craig v. United States*, Brief for the United States, No. 96-6264, 1997 WL 33773540 *7-10 (C.A.2 Nov. 4, 1997) with *In re Craig*, *supra*.   Instead, the Second Circuit relied entirely on its earlier *Biaggi* decision and the Eleventh Circuit's decision in *In re Hastings*, both of which were decided prior to the Supreme Court's subsequent delimitations on the use of inherent authority.   *Id.*

The district court in *American Historical Association* mentions the more recent Supreme Court jurisprudence, but dismisses *Carlisle* and *Bank of Nova Scotia* in a footnote, in which, without analysis, it "reject[ed] the Government's contention that the 'special circumstances' exception 'circumvent[s] or conflict[s] with the Federal Rules of Criminal Procedure.'" *American Historical Assn*, 49 F. Supp. 2d at 287 n.6 (internal citation omitted).   The court in *American Historical Association* did discuss the Supreme Court's decision in *Williams*, but found that the government's reading of it was "implicitly" rejected in *Craig*, and in any event unpersuasive.   *Id.* at 285.   In that regard, the district judge erroneously relied on *Douglas Oil*, *Sells Engineering*, and *Pittsburgh Plate Glass Co.*, to support its contention that the Supreme Court has long countenanced federal court discretion to fashion disclosure standards.   *American Historical Assn*, 49 F. Supp. 2d at 286.   Each of those cases – contrary to the meaning ascribed to them by the district court and these petitioners – stands for the unremarkable proposition that a court retains discretion to determine whether a particularized need for disclosure exists *within* those categories of disclosures permitted by Rule 6(e).   *See, e.g.*, *Pittsburgh Plate Glass*, 360 U.S. at 398-399 ("any disclosure of grand jury minutes is covered by Fed. Rules Crim. Proc. 6(e) promulgated by

this Court in 1946 after the approval of Congress"). None supports the proposition that a court may, in disregard of Rule 6(e), create new categories of disclosure not adopted by Congress or mandated by the Constitution.

The courts recognizing "historical significance" as an exception to grand jury secrecy also disregard the *Carlisle* line of cases by adhering to the rationale, expressed in *In re Hastings,* that Rule 6(e) is beholden to the development of the common law through the courts. As the district court in *American Historical Association* explained this theory, courts determined whether there should be exceptions to the rule of grand jury secrecy long before the Federal Rules came into being, and Rule 6(e) is simply a reflection of the case law as developed by the courts. In other words, the "history of Rule 6(e) indicate[s] that the exceptions permitting disclosure were not intended to ossify the law, but rather are subject to development by the courts." *American Historical Assn*, 49 F. Supp. 2d at 286, quoting *In re Hastings*, 735 F.2d at 1269; *accord Craig*, 131 F.3d at 102; *In re Petition of Kutler*, 800 F. Supp. 2d 42, 46 (same). It follows, these courts held, that while courts should adhere to Rule 6(e) in the "garden-variety' case, *Craig,* 131 F.3d at 103, they are free to depart from the Rule in appropriate circumstances. *Id.*

This analysis is flawed in numerous respects. First, it is undisputed that Rule 6(e) was adopted by Congress and has all the force and effect of a statute. Thus, like any other statute, it is not merely an advisory point of procedure – it represents the considered view of Congress. Just as courts must adhere to the plain language of a statute, so too must they abide by the plain language of Rule 6(e). Second, the import of *Carlisle* was to reiterate that courts may *not* exercise their discretion in such a way as to circumvent the Federal Rules of Criminal Procedure. By treating Rule 6(e) as a useful but flexible guidepost subject to the trial court's exercise of discretion to depart from it, these courts have turned *Carlisle* on its head. Third, the courts and petitioners err

- 19 -

in relying on *Pittsburgh Plate Glass Co*, in which the Supreme Court observed that Rule 6(e) "is but declaratory" of the principle that "disclosure is committed to the discretion of the trial judge." *Id*. at 399. *Pittsburgh Plate Glass Co*. provides no support for the theory that courts retain broad discretion to apply Rule 6(e), or not. *Pittsburgh Plate Glass Co*. addressed the circumstances in which a district court could order the disclosure of grand jury materials for use by a defendant in the cross-examination of a witness at trial— *within* the exceptions permitted by Rule 6(e). *Id*. at 398-400. In that context, disclosure is committed to the trial court's discretion, as Rule 6(e) itself states.[5]

Finally, it makes little sense to rely on the proposition that the Federal Rules merely codify the prior jurisprudence of courts. All statutes are informed by experience, and many codify the common law as developed by the courts. Nevertheless, statutes may not be disregarded in favor of the policy judgments of courts under the theory that Congress will simply catch up. Indeed, it is instructive that Congress has revisited Rule 6(e)'s disclosure provisions on numerous occasions, including as recently as 2002, and has never seen fit to add either a "public interest" exception to grand jury secrecy, or to set a time limit on grand jury secrecy in recognition of potential future historic interest.[6] If there are to be exceptions to Rule 6(e), it is Congress, and not the Judiciary,

---

[5] To interpret *Pittsburgh Plate Glass Co*. otherwise would be to ignore the Court's admonition "that *any* disclosure of grand jury minutes is covered by Fed. Rules Crim. Proc. 6(e) promulgated by this Court in 1946 after the approval of Congress." *Pittsburgh Plate Glass Co., supra* at 398-99 (emphasis added). Indeed, the focus of both the majority and dissenting opinions was limited to the application of Rule 6, and not the "inherent authority" advocated here by petitioners.

[6] The disclosure provisions of Rule 6(e) were amended in 1977, Pub. L. 95-78, 91 Stat. 319 (clarifying access to grand jury information by government personnel;); in 1984, Pub. L. 98-473, 98 Stat. 1837(permitting disclosure to state officials of matters that may disclose a violation of state criminal law); in 1989, in the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), 18 U.S.C. § 3322 (authorizing certain disclosures to a financial institution regulatory agency upon showing of substantial need); in 1994 , in the International Antitrust Enforcement Assistance Act of 1994, 15 U.S.C. §§ 6201-12 (authorizing disclosures to a foreign antitrust authority upon showing of particularized need); and in 2002, in the USA Patriot Act, Pub.

that must supply them.

### D.     A Departure from the Plain Text to Create a Historical Interest Exception Is Particularly Unjustified

While departure from the plain text of Rule 6(e) to exercise inherent authority is

unwarranted, a departure for the sake of "historical interest" is particularly so.   Historically, the

exceptions to grand jury secrecy grew out of a recognition that grand jury secrecy must sometimes

yield in order to further the "ends of justice" in a particular case.   *See, e.g., United States v.*

*Socony Vacuum Oil Co.*, 310 U.S. 150, 234 (1940) (prosecutor could use witness' grand jury

information to refresh recollection during trial, as court had discretion to breach grand jury secrecy

where "the ends of justice" require it); *Pittsburgh Plate Glass Co.*, 360 U.S. at 399 (particularized

needs that may overcome grand jury secrecy include the need "to impeach a witness, to refresh his

recollection, to test his credibility and the like"); *Douglas Oil*, 441 U.S. at 219-220 (in some

situations "justice may demand" that discrete portions of grand jury information be disclosed);

Fed. R. Crim. P. 6(e)(3)(E)(i).

Because Rule 6(e)'s exceptions to grand jury secrecy arose out of concerns for protecting

the accused and ensuring justice in particular cases, it is unsurprising that the first courts to rely on

inherent authority to disclose grand jury information did so because they determined that *justice*

required it in particular and extraordinary situations.   In the *Biaggi* case, for example, Judge

Friendly permitted limited public release of an elected official's grand jury testimony after the

official publicly denied having invoked his Fifth Amendment privilege in the grand jury and

publicly stated his non-opposition to the release.   In the *Hastings* case, the Eleventh Circuit

permitted release of grand jury testimony to the legislature for purposes of an impeachment

---

L. 107-56 § 203(a)(1), 115 Stat. 272 (permitting disclosure to law enforcement of matters
involving foreign intelligence or counterintelligence); *see also* 2002 amendment to permit
disclosure to armed forces personnel for purposes of enforcing Uniform Code of Military Justice.
*See Generally* Fed. R. Crim. P. 6, Advisory Committee Notes.

proceeding.   Indeed, in *Hastings*, the court emphasized that reliance on inherent authority would only be appropriate in "exceptional circumstances consonant with the rule's policy and spirit." *Hastings*, 735 F.2d at 1269.   The *Hastings* court authorized disclosure only because it was "backed by a congressional mandate" and because the materials were needed in connection with "judge-run" proceedings that were "little removed from the judicial proceedings encompassed with the Rule [6(e)(3)(C)(i)] exception."   *Id*.   Impeachment proceedings and the close analogue between the grand jury and the functioning of the Judiciary Committee in that unique instance similarly animated the disclosure of the grand jury's report in the *Haldeman* case.

Historical interest does not fit within the traditional "policy and spirit," *Hastings,* 735 F. 2d at 1272, animating the creation of exceptions to grand jury secrecy.   There is nothing exceptional about a request to examine grand jury materials based on an interest in their contents.   Such requests do not generally present a situation where the denial of disclosure will work some unfairness in civil or criminal litigation, or where disclosure is necessary to ensure that justice is done in an important public proceeding or to correct some public misapprehension on a matter of widespread public concern.   Instead, requests under the historical interest exception simply seek to increase the total amount of information about past events that is available to the public.   Even if part of a significant project of historical scholarship, such requests could not easily be distinguished from journalistic inquiries into subjects of public interest or requests based simply on individual or public curiosity.

The current proceedings illustrate the point.   Mr. Carlson seeks the unsealing of the grand jury testimony in order to aide him in writing a book.   Carlson Decl., Exh. A.   His claim is one available to any member of the press or public.   Indeed, his request is akin to another request pending in the District of Columbia.   *McKeever v. Holde*r, Misc. No. 13-00054 (D.D.C.)

(pending).   In that case, petitioner seeks the unsealing of an entire grand jury investigation because it would aide him in researching and writing a book about the 1957 *John Joseph Frank* case, which was associated with a suspected kidnapping by the Trujillo regime in the Dominican Republic.   The potential proliferation of requests to unseal based on historical interest – including requests for the wholesale release of grand jury investigations – opens the door to the erosion of grand jury secrecy based on nothing but the discretion of individual courts, untethered to the statute addressing grand jury secrecy and its exceptions.   As the Supreme Court has consistently recognized, "the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities." *Douglas Oil,* 441 U.S. at 222 (recognizing need to encourage prospective witness to testify willingly and truthfully, and the need to protect the reputations of those who are accused but not indicted.)   Many federal indictments attract public attention, yet neither the Supreme Court nor Congress has ever suggested that public interest alone merits an exception to grand jury secrecy.   Instead, Rule 6(e) itself strikes a balance between grand jury secrecy and the need to pierce that secrecy when the "ends of justice" require it.[7]   In the absence of an amendment to that Rule, historical interest in grand jury proceedings satisfies neither the plain language of the Rule nor the reasons animating the adoption of the Rule.

---

[7] The grand jury's primary Constitutional function is to investigate possible criminal activity and to bring criminal charges when it determines probable cause exists.   It is in this context that "ends of justice" is best understood, *i.e.*, basic fairness and due process to a criminal defendant.   As part of the Rule's comprehensive control of grand jury secrecy and disclosures, Rule 6(e)(3)(A)(i) provides that attorneys for the government use grand jury information in performing their duties including making automatic disclosure to a defendant of his or her relevant grand jury testimony (Fed.R.Crim.P. 16 (a)(1)(B)(iii)) as well as disclosure to a defendant of the relevant grand jury testimony of witnesses at various stages of the criminal case and disclosure of grand jury information that is favorable to a defendant and material to guilt or punishment. *See*, *e.g.*, *United States v. Elem*, 269 F.3d 877, 881-82 (7th Cir. 2001).   Further, a criminal defendant may seek an order requiring disclosure of grand jury proceedings upon a showing that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury (R. 6(e)(3)(E)(ii)).

### III.    The Supreme Court's Rulemaking Body Has Rejected an Amendment to Rule 6(e) Based on Historical Interest.

In the wake of the district court decision in *Kutler*, the Department of Justice, with the support of the National Archives and Records Administration ("NARA"), brought a proposal to the Federal Advisory Committee on the Criminal Rules, a rulemaking body under the jurisdiction of the Standing Committee on Rules of Practice and Procedure ("Standing Committee").   The Standing Committee has the authority to recommend federal rules of procedure to the Judicial Conference, which subsequently recommends them to the Supreme Court for adoption.   *See generally* 28 U.S.C. § 331; http://www.uscourts.gov/FederalCourts/JudicialConference/Committees.   The Department's proposal would have amended Criminal Rule 6(e) to permit NARA to open certain archival grand jury records of historical significance and all archival grand jury records as a matter of course after the passage of 75 years.   The Criminal Rules Advisory Committee created a subcommittee to study the issue.   Ultimately, the subcommittee rejected the proposal and it did not advance to either the full Criminal Rules Advisory Committee or the Standing Committee.   In addressing the reasons why the subcommittee voted against the proposed rule change, the Advisory Committee Chair explained that, with respect to the proposed sunset on grand jury secrecy[8], "it would be a radical change to go from a presumption of absolute secrecy, which is how grand juries have always operated, to a presumption that grand jury materials should be presumed open after a certain number of years.   A change of that magnitude . . . would have to be accomplished through legislation, rather than a rule change."   Minutes, Committee on Rules of Practice and Procedure,

---

[8]  The Chair also explained that "the archivist has a natural, institutional inclination towards eventually releasing historical archived documents," and that, in the relatively few cases seeking disclosure of grand jury material based on historical significance, "district courts had reasonably exercised their inherent authority."   Minutes, *id*. at 44.

- 24 -

June 2012, p. 44, available at

http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Minutes/ST06-2012-min.pdf.

Here, the primary basis petitioners offer in support of releasing the grand jury records at

issue is the passage of time. *See, e.g.,* Petition at 7 ("material is decades old, traditional

justifications for secrecy have disappeared, and the witnesses are deceased"); 11 ("seventy-two

years have elapsed since the grand jury heard testimony"); 12 ("most of the people . . . passed away

more than 40 years ago").   But the policy body charged with recommending changes to the

Federal Rules rejected just such a result because "a change of that magnitude" should be

accomplished through legislation.   If the rule-makers believe that only Congress can set an

expiration date on grand jury secrecy, it can scarcely be argued that individual district courts

should be left to make such decisions on an *ad hoc* basis, in contravention of Rule 6(e), and

without the support of any legislative policy judgment.   Because courts lack inherent power to

disclose grand jury records for reasons of historical interest, the court here should decline to order

disclosed the grand jury records that petitioners seek.[9]

---

[9] Even if this court determines that it has the inherent authority to order disclosure, it should still
deny the petition.   The grand jury in this matter declined to return an indictment, and under those
circumstances, grand jury secrecy is at its apex.   *See Douglas Oil Co.*, 441 U.S. at 219 ("by
preserving the secrecy of the proceedings we assure that persons who are accused but exonerated
by the grand jury will not be held up to public ridicule.")   Mr. Carlson seeks disclosure of the
grand jury proceedings here to assist him with the research and writing of a book that he hopes and
will be of broader interest to the public.   Nothing distinguishes his request from any other
journalist or historian researching a topic of academic interest.   Although petitioners try to tie the
*Johnston* investigation to public debate surrounding leak prosecutions in general, there can be little
question that this unindicted matter comes nowhere near the significance of other matters where
courts have reached outside the rules to release grand jury testimony.   It does not, for example,
rise to the level of an enduring public chapter of our history in the same way as Watergate and the
Alger Hiss/Whittaker Chambers affair.   Accordingly, there is nothing "exceptional" about the
request, and the petition should be denied.

## CONCLUSION

For all the foregoing reasons, the petitioner's Motion for an Order Directing Release of

Grand Jury Information should be denied.

Dated: Dec. 24, 2014

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

ZACHARY FARDON
United States Attorney

DANIEL W. GILLOGLY
MARK E. SCHNEIDER
Assistant United States Attorneys


_____*/s/ Elizabeth J. Shapiro*_____
ELIZABETH J. SHAPIRO
D.C. Bar #418925
United States Department of Justice
Tel: (202) 514-5302
Fax: (202) 616-8460
elizabeth.shapiro@usdoj.gov
Attorneys for the United States

# EXHIBIT A

**WENDELL BERGE**
ASSISTANT ATTORNEY GENERAL

## Department of Justice
### Washington

July 27, 1942

MEMORANDUM FOR THE ATTORNEY GENERAL

OFFICE OF THE
RECEIVED
JUL 28 1942
ATTORNEY GENERAL

I have examined the report of William D. Mitchell on the Chicago Tribune case.

It is my recommendation that no prosecution be instituted. I think that Mr. Mitchell's analysis demonstrates that it is quite improbable that a conviction could be obtained, and I think that this is a case which we can not afford to bring unless there is a reasonable certainty of winning.

Moreover, in addition to the factors pointed out in Mr. Mitchell's memorandum, I do not think that this is a case that the public would ever understand. Technical explanation is necessary to spell out the violation, consequently the whole case would become engulfed in questions of freedom of the press, censorship, etc. I do not think we could succeed in making our position clearly enough understood to accomplish any real public benefit.

I thoroughly agree with Mr. Mitchell that the conduct of Maloney and Johnston was despicable, but I think that the legal grounds for prosecution are too tenuous and the chances of public misunderstanding too great to undertake prosecution. It would probably be best to follow Mr. Mitchell's suggestion to submit the question to the Navy and invite its judgment but, in any event, I would advise against prosecution.

Respectfully submitted,

*Wendell Berge*

WENDELL BERGE
Assistant Attorney General

FILE

146-7-23-25
DEPARTMENT OF JUSTICE
NOV 30 1945 A.M.

RECORD

146-7-23-25

July 14, 1942

RECORD

REPORT ON CHICAGO TRIBUNE CASE

For the Attorney General and the Secretary of the Navy.

by William D. Mitchell

I

Preliminary Statement

On May 31, 1942, Admiral Nimits, commander-in-chief at Pearl Harbor, broadcast in code to all ships of the Pacific fleet a message, marked secret, giving in detail his estimate of the composition of the Japanese fleet approaching Midway. That message was received and decoded on the Navy Transport Barnett, headed for San Diego. On that ship was Stanley Johnston, correspondent for the Chicago Tribune.

The material in the Nimits dispatch of May 31 was information collected by Naval Intelligence at Pearl Harbor. That dispatch divided the Japanese force into three sections, a "striking force", a "support force" and an "occupation force" and gave the number and names or types of the ships in each of the three named divisions.

Johnston landed at San Diego the night of June 2. On the 4th he went to Chicago. On the night of Saturday, June 6th, news came from Pearl Harbor confirming previous reports of the battle at Midway. Johnston read it and went to Maloney, Managing Editor, and told him he had some "dope" on the make up of the Japanese Midway fleet, and was asked by Maloney to prepare an article for publication, which he did. Within a few hours (about 4 a.m. Sunday the 7th) the article, in a somewhat rewritten form, appeared in

- 2 -

the Tribune.  The gist of the article was that the Navy had had
advance information of the composition of the Japanese Midway
fleet, and the article states specifically what that composition
was, as known to the Navy before the Midway battle.  A comparison
of the Nimitz secret dispatch of May 31, as received and decoded
on the Barnett, with the description of the Japanese fleet as
contained in the Tribune article of June 7 establishes not merely
to a "moral" certainty but to an absolute certainty that Johnston,
the author of the article, had access on the Barnett to the Nimitz
dispatch or had an opportunity to make and did make a copy of the
substance of the dispatch, either from the original or from a memo-
randum containing the substance of the dispatch.

The description in the article of the Japanese Midway
fleet is almost an exact duplication of the information contained in
the Nimitz dispatch.  It is a copy of the dispatch elaborated to some
extent by such information as could be taken from the book "Jones
Fighting Ships."  The article lists the Japanese vessels in each of
the three "forces" in the same order as in the dispatch.  The elabora-
tions may be illustrated thus:

The dispatch under "striking force" states:

"Four carriers, Akagi, Kaga, Hiryu, Soryu."

The article under "striking force" elaborates as follows:

"Four aircraft carriers, the Akaga and Kaga of
26,900 tons each, and the Hiryu and Soryu of
10,000 tons each."

No amount of evasion or perjury will avail to negative the con-
clusion that Johnston while on the Barnett obtained or made a
substantially complete copy of the Nimitz dispatch.  To reproduce
the Nimitz dispatch as he did in the article, overhearing dis-
cussion of the Nimitz dispatch would not alone suffice.  Too great
a feat of memory would be required.  This does not mean that he
knew anything about a secret dispatch, or that the paper he says
he found on his desk was in the form of a dispatch.

The article of June 7 was published by the Tribune
without submission to the Navy or any Government agency for censor-
ship.

The question is whether a violation of any criminal statute
is shown.

- 3 -

## II

### The Statute

The applicable statute is section 31 (d) of the Act of June 15, 1917, chapter 30, section 1, 40 Stat. 217 as amended by the Act of March 28, 1940, chapter 72, section 1, 54 Stat. 79 which reads:

> "(d) who ever, lawfully or unlawfully having possession of, access to, control over, or being intrusted with any document, writing, . . . or note relating to the national defense, wilfully communicates or transmits or attempts to communicate or transmit the same to any person not entitled to receive it. . . shall be punished by a fine of not more than $10,000 or by imprisonment for not more than ten years, or both."

The Nimitz dispatch or any copy or "note" of it, obviously was a "document", "writing" or "note" relating to the national defense.

The available proof shows that Johnston on the Barnett had access to or possession of the Nimitz dispatch, or of a "writing" or "note" which was a substantial copy.

The comparison between the dispatch and the article of June 7, shows that conclusively.

Johnston's first statement to the Navy officers, June 8, was that some information embodied in his article was obtained through open discussion with officers on the Barnett. The same day he came back to the Navy, and admitted that, just before landing, he found a paper in his quarters with some statement on it about the Japanese fleet and he made a copy of the document. All officers on the Barnett deny showing Johnston the Nimitz dispatch or giving him a copy.

Two officers state they remember seeing Commander Seligman, formerly executive officer of the Lexington, working at a table in the quarters Johnston shared and that before him was a writing on Navy paper giving a list of Japanese vessels divided into "striking force", "support force", etc.

Seligman says he does not remember making such a memorandum from the Nimitz dispatch but he may have done so.

The probability is that he did and left it lying around and that is what Johnston found and copied.

- 4 -

The remaining question under the statute is whether Johnston, the Tribune, and Maloney, the Managing Editor, together or separately "communicated" the contents of the Nimitz dispatch or the contents of a note or writing constituting a copy, to "any person not entitled to receive it" by publication in the Tribune.

III

Requirement of Navy Censorship

Johnston, at Tribune's request, was permitted on vessels of the Pacific fleet of which the Barnett was one. As a condition to obtaining that special privilege he was instructed by Navy officials that he should not publish any story of his experiences or any story containing any information obtained while on vessels of the Pacific fleet without first submitting the material to the Navy for censorship.

First instructions to that effect were given him orally by Commander Drake and Lieutenant Bassett at Pearl Harbor. The letter of April 14 from Nimitz to Captain Sherman of the Lexington, arranging passage for Johnston on that vessel states Johnston was authorized "to take passage in ships of the Pacific fleet, for the purpose of obtaining news material, to be published after censorship of the commander-in-chief of the Pacific fleet." Similar instructions were repeated to Johnston by Captain Sherman. After it had been decided that Johnston should return to the mainland instead of to Honolulu and could not reach Nimitz for censorship, Sherman told him to clear his articles through the commander-in-chief at Washington. Johnston admits all this and that he agreed to abide by these restrictions. (The reason he was not asked to sign a written agreement was that the Navy regulations requiring it, dated April 12, 1942, had not reached Pearl Harbor when Johnston sailed on the Lexington April 15.) It is also undisputed that Maloney was told by Johnston on the phone from San Diego, June 3, that all material obtained by him while on the fleet, had to be submitted to the Navy for censorship.

The statute does not define the persons "authorized to receive" information about the national defense. That is left to regulations, rules or orders of the executive departments.

The Navy had authority to require that information obtained while with the Pacific fleet should not be disclosed to the public, until after censorship. Therefore Johnston's published article certainly containing information from a writing or

- 5 -

note obtained from Navy sources while on the Barnett and published
without previous censorship amounted to a communication to persons
not authorized to receive it.

## IV

### The Case Against Johnston, the Tribune Corporation and Maloney, Managing Editor, Considered Separately.

It should be noted that the statute punishes only communication of a document, writing, or note relating to national
defense. Johnston is guilty of obtaining the contents of such a
document or note and disclosing them to the Tribune for publication. That might establish an offense by him were it not for the
fact that the statute requires a wilful disclosure. The Navy
restrictions did not specifically require him to submit his articles
to the Navy before handing them to his paper. Indeed his practice,
since he arrived at Chicago, June 4, has been to submit his other
articles to his paper, and then the Tribune officials have, before
publication, submitted them to the Navy.

I do not believe that a jury would convict Johnston
merely for giving his June 7 article to the Managing Editor.
If we could show that Johnston, when he copied the document he found
lying on his desk on the Barnett, knew it was a copy of a secret
document that he had no right to see, we might make a case against
him merely for disclosing its contents to his editor, but there
is no proof that he knew or had reason to believe the document he
found was in any sense "secret". The fact that it was left lying
around would indicate its lack of "secrecy" and admittedly he had
heard the matter in the memorandum openly discussed in his presence
by the officers on the Barnett. As to Maloney, the proof is ample
that he knew the information in Johnston's article of the 7th had
been obtained in part from Navy officers by discussions with them
on the Barnett. The proof may well show that he deliberately
violated the agreement with the Navy by publishing, without Navy
censorship, some information obtained by Johnston while on the
Barnett, but that is not necessarily a violation of the statute.
The statute is limited to communicating the contents of a document,
writing or note. Maloney denies he was told or knew that the information came from any document. Johnston says he did not tell
Maloney that his story of June 7 came from any writing or document.
How can it be said that Maloney wilfully offended if he did not
know that the source of the material was a writing? Unless, therefore, the case against Maloney can be based on the theory that

- 6 -

the document or writing he improperly published was Johnston's
story written June 6, (and not the Nimitz dispatch or a copy of
it) his conviction would be doubtful. It would involve too strained
a construction of a criminal statute. I doubt if, on reading the
entire statute, a judge would hold against Maloney that the "document,
writing or note" mentioned in the statute, included Johnston's
written story of June 7 or anything other than some official paper.
He might give a broader interpretation to the statute but it would
be taking a great risk to rely on such an interpretation. Unfor-
tunately the statute is badly deficient so far as this case is
concerned.

If subsection (d) had used the word "information" as
well as "writing" and "note", our case would have a solid founda-
tion. The Tribune Corporation would surely be convicted if Maloney
is found guilty. If Maloney is acquitted, the Tribune might be
convicted if Johnston is convicted on the theory that the knowledge
of Johnston, its employee, is imputed to his principal, and Johnston
knew the story came from a "document" or "writing." The difficulty
here may be that if Johnston deceived his paper by concealing the
fact that he had obtained his information from a document he
surreptitiously copied on the Barnett, then Johnston's knowledge
might not be imputed to the Tribune Corporation. If both Johnston
and Maloney were acquitted, there would be no rational basis for
convicting the Corporation.

V

Ought a Prosecution to be Instituted?

The evidence available justifies the conclusion that
neither Maloney nor Johnston is telling the truth; that on the
night of June 6 Maloney realised that Johnston had obtained on
the Barnett inside information as to what Navy Intelligence had
learned by May 31 as to the composition of the Japanese Midway
fleet; that he realized he had a "scoop", that it was hot news
which he wanted to publish immediately without the delay of Navy
censorship and without taking a chance that Navy might suppress
it. He thought he was covering up as to the source of the infor-
mation and the fact that it was acquired by Johnston on the Barnett
and thus subject to Navy censorship by concealing the fact that it
was a Johnston story and attributing its source to Washington, D. C.
and disclosures made there by unnamed officers of Naval Intelligence —
a despicable thing to do as it cast suspicion of "leakage" on ONI
officers in Washington.

- 7 -

Having, as he thought, thus dodged Naval censorship, he checked up on the Code of War Time Practices for the Press and concluded that it did not cover the case because the Japanese fleet was not "in or near American waters."

Then he published the article, with a total and reckless disregard of any possible injury to the cause of national defense.

It is hard to be reconciled to a conclusion that this newspaper and Maloney and Johnston may be allowed to go without punishment especially as the press generally is sincerely trying to make sure that it avoids all revelations damaging to the nation, but there are several things to be considered.

1. Conviction is far from certain owing mainly to the deficiencies of the statute above mentioned. I can give no assurance of conviction. Because of various conditions I do not enumerate, it would be unfortunate if a prosecution should be begun and result in an acquittal. It would hurt the Administration and consequently the cause of national defense.

2. The "atmosphere" about military censorship is not so good at present. The press has ganged up on the Administration against military censorship in connection with the Military Commission now sitting.

   The Tribune can make some impression in this case by the argument that the story was laudatory of the Navy and did no harm because it had already been stated in press dispatches from Honolulu that the Navy had advance information of the composition of the Japanese fleet.

3. Many naval officers needed for other duties would be required as witnesses - some for the grand jury, many more for a trial. A grand jury at Chicago might be available immediately but a trial would not occur before September or October. Attached is a list of officers needed as witnesses.

4. My very first reaction to this case was that a jury would not appreciate the damage of the publication unless it were disclosed at the trial that the "advance information" was derived in considerable part from intercepted Japanese messages with all that implies and put the Japanese wise to, and in a position to dry up sources of Naval Intelligence. The developments have confirmed that view. The defense can argue to a jury that there was little more disclosed by the publication than had already been stated or intimated in press dispatches from Honolulu, and they can argue and have already argued that all the "advance

- 8 -

information" could have been gained by submarine and air scouting. A trial would necessarily disclose the means by which the Navy obtained the information and a trial is public.

5. If perchance the Japanese have not been put wise by the publication, the added publicity of a trial might have that result.

6. The trial may involve some disclosures about our own naval code in use May 31. Nimitz's coded dispatch of May 31 was doubtless intercepted by the Japanese. The exposure at the trial of a decoded copy of the Nimitz dispatch offers a ready means to Japanese to solve Nimitz's code of May 31. It may be they have already done so and our code may have been changed; only the Navy could know about this.

7. Finally, and it is not pleasant to say, the trial would develop the situation on the Barnett as to handling of "secret" dispatches. The fact is that Johnston got his hands on Nimitz's secret dispatch or a complete copy of it. If, as appears likely, some officer left a copy of that dispatch lying around, it may fairly be said there was as much carelessness on ship as the Tribune was guilty of, and the jury may think so.

In the light of all these conditions, I think the question whether the "game is worth the candle" should be first submitted to the Navy and its judgment invited as to whether the national effort at the time would be better served by prosecuting the case or dropping it.

William D. Mitchell

# EXHIBIT B

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 87-5345 ————————————— September Term, 1987
MISC. C.A. No. 87-0230

In re: Petition of Robert P. Newman

BEFORE: Ruth B. Ginsburg, D.H. Ginsburg and Sentelle, Circuit Judges

# O R D E R

Upon consideration of appellee's motion for summary affirmance and the opposition thereto, it is

ORDERED by the court that the motion for summary affirmance be granted for the reasons stated in the accompanying memorandum.

The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. *See* D.C. Cir. Rule 15.

*Per Curiam*

**UNITED STATES COURT
OF APPEALS
For the District of Columbia
Circuit**

**FILED APR 20, 1988**

**CONSTANCE L. DUPRE
CLERK**

2a

No. 87-5345—*In re Petition of Robert P. Newman*

## MEMORANDUM

Appellant Newman appeals the district court's denial of his petition to unseal the transcripts of certain McCarthy-era grand jury proceedings. Appellant argues the transcripts at issue are of historical significance and should be disclosed to him, as there is no claim that disclosure would cause any harm. The Government moves to summarily affirm the district court's order, asserting that the ''general rule of secrecy,'' under Fed. R. Crim. P. 6(e)(2), while allowing certain exceptions, makes no provision for disclosure of grand jury transcripts to a private party for historical research purposes. We agree and affirm the district court's judgment.

As a starting point, the Supreme Court has emphasized ''that the proper functioning of the grand jury system depends upon the secrecy of grand jury proceedings.'' *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979). *See* Fed. R. Crim. P. 6(e)(2). Recognizing the limited exceptions to the rule of secrecy (as delineated in Fed. R. Crim. P. 6(e)(3)), courts are nonetheless reluctant to ''lift unnecessarily the veil of secrecy from the grand jury.'' 441 U.S. at 219.

Drawing from its decisions in *U.S. v. Procter & Gamble Co.*, 356 U.S. 677 (1958), and *Dennis v. U.S.*, 384 U.S. 855 (1966), the Supreme Court, in *Douglas Oil*, devised a balancing test for deciding when disclosure of grand jury material may be appropriate within the bounds set forth in Rule 6(e)(3). If the purpose for which the disclosure is sought falls within one of the Rule 6(e)(3) categories, and if the private party seeking disclosure can demonstrate ultimately that the ''particularized need'' for disclosure (*see, e.g., U.S. v. Sells Engineering, Inc.*, 463 U.S. 418, 443 (1983)) outweighs the public interest in

rt P. Newman

UM

trict court's denial of his
tain McCarthy-era grand
e transcripts at issue are
be disclosed to him, as
ld cause any harm. The
firm the district court's
ule of secrecy,'' under
ving certain exceptions,
grand jury transcripts to
purposes. We agree and

art has emphasized ''that
ry system depends upon
gs.'' *Douglas Oil Co. v.*
l, 218 (1979). *See* Fed.
imited exceptions to the
l. R. Crim. P. 6(e)(3)),
ift unnecessarily the veil
41 U.S. at 219.

. *Procter & Gamble Co.,*
S., 384 U.S. 855 (1966),
devised a balancing test
d jury material may be
th in Rule 6(e)(3). If the
ought falls within one of
e private party seeking
that the ''particularized
*Sells Engineering, Inc.*
s the public interest in

secrecy and the possible chilling effect on future grand jury proceedings, only then may the court permit disclosure. *Douglas Oil*, 441 U.S. at 223.

Professor Newman seeks the Lattimore transcripts for historical purposes, solely to reveal what transpired during those grand jury proceedings. There is no claim that disclosure is sought in connection with any judicial proceeding[1] or other category of circumstances delineated in Rule 6(e)(3). Those categories are so circumscribed because of the legitimate concern about ''the possible effect upon the functioning of future grand juries of unduly liberal disclosure.'' *In re Donovan*, 801 F.2d 409, 410 (D.C. Cir. 1986) (per curiam). Since a claim of historical importance, without more, falls outside the scope of the Rule 6(e)(3) exceptions permitting disclosure, the district court's denial of Professor Newman's petition to unseal the Lattimore grand jury transcripts was appropriate.

---

[1] The judicial proceeding exception, under Rule 6(e)(3)(C)(i), does not contemplate ''the very proceeding instituted for the purpose of obtaining disclosure.'' *Hiss v. Department of Justice*, 441 F. Supp. 69, 70 (S.D.N.Y. 1977), quoted in *Fund for Constitutional Government v. NARS*, 656 F.2d 856, 868 (D.C. Cir. 1981).

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 87-5345                           September Term, 1987

C.A. No. 87-0230
United States Court of Appeals
For the District of Columbia
Circuit
FILED JUL 1, 1988

CONSTANCE L. DUPRE
CLERK

In Re:

Petition of Robert P. Newman

BEFORE: Ruth B. Ginsburg, D.H. Ginsburg and Sentelle,
Circuit Judges

## ORDER

Upon consideration of appellant's petition for rehearing it
is

**ORDERED**, by the court, that the petition is denied.

FOR THE COURT:

CONSTANCE L. DUPRE
CLERK

BY: /s/ Robert A. Bonner
Robert A. Bonner
Deputy Clerk

Case: 1:14-cv-09244 Document #: 11 Filed: 12/24/14 Page 48 of 50 PageID #:111

OF APPEALS
UMBIA CIRCUIT

ptember Term, 1987

0230
s Court of Appeals
rict of Columbia

1, 1988

E L. DUPRE

nsburg and Sentelle,

tion for rehearing it

petition is denied.

URT:

L. DUPRE,

t A. Bonner
ner

---

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 87-5345          September Term, 1987

C.A. No. 87-0230
**United States Court of Appeals**
**For the District of Columbia**
**Circuit**

**FILED JUL 1, 1988**

**CONSTANCE L. DUPRE**
**CLERK**

In Re:

Petition of Robert P. Newman

BEFORE: Wald, Chief Judge; Robinson, Mikva, Edwards,
Ruth B. Ginsburg, Starr, Silberman, Buckley,
Williams, D.H. Ginsburg and Sentelle, Circuit
Judges

## ORDER

Appellant's suggestion for rehearing *en banc* has been cir-
culated to the full court. No member of the court requested
the taking of a vote thereon. Upon consideration of the forego-
ing it is

**ORDERED**, by the court *en banc*, that the appellant's suggestion for rehearing *en banc* is denied.

FOR THE COURT:

CONSTANCE L. DUPRE,
CLERK

BY: /s/ Robert F. Bonner
Robert A. Bonner
Deputy Clerk

Chief Judge Wald did not participate in this order

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that the foregoing document was served on December 24, 2014, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

s/ *Dan W. Gillogly*
DAN W. GILLOGLY
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 886-1328