UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELLIOT CARLSON, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | No. 14 C 9244 |
| | ) | |
| v. | ) | Chief Judge Rubén Castillo |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Elliot Carlson ("Carlson"), a naval historian and author, along with the Reporters Committee for Freedom of the Press, the American Historical Association, the National Security Archive, the Naval Historical Foundation, the Naval Institute Press, the Organization of American Historians, and the Society for Military History (collectively, "Petitioners") filed a petition (the "Petition") requesting the release of transcripts of witness testimony given during a grand jury investigation of the *Chicago Tribune* (the "*Tribune*") in August 1942. (R. 1, Pet. at 2; R. 4, Pet'rs' Mem. at 1-2.) For the reasons stated below, the Court grants Petitioners' request.

## BACKGROUND

On June 7, 1942, the *Tribune* published a front-page story headlined, "*Navy Had Word Of Jap Plan to Strike At Sea.*" (R. 4, Pet'rs' Mem. at 2.) The author was *Tribune* war correspondent Stanley Johnston, who had been traveling aboard the U.S. Naval ship the *USS Barnett*. (*Id.*; R. 4-1, Carlson Decl. ¶ 11.) The article cited "reliable sources in naval intelligence" and suggested that the Navy had detailed information regarding Japan's military plan to attack the United States at Midway in advance of the battle. (R. 4, Pet'rs' Mem. at 2-3.) The article appeared to have been based on a classified dispatch revealing that the Navy had

successfully cracked the radio codes used by the Japanese to encrypt their communications. (*Id.* at 3.) Other newspapers, including the *New York News* and the *Washington Times-Herald*, republished the *Tribune* story. (R. 4, Pet'rs' Mem. at 3; R. 4-1, Carlson Decl. ¶ 16.) The *Tribune* article angered high-ranking military officials, as well as President Franklin D. Roosevelt, who called for a federal investigation of the *Tribune* for violations of the Espionage Act of 1917.[1] (R. 4, Pet'rs' Mem. at 3.)

In August 1942, the United States Department of Justice ("DOJ") convened a grand jury in Chicago to investigate whether *Tribune* staff, including Johnston and managing editor J. Loy Maloney, had violated the Espionage Act. (*Id.*) The grand jury heard testimony from Rear Admiral Frederick C. Sherman, Commander Morton Seligman, Lieutenant Commander Edward O'Donnell, Lieutenant Commander Edward Elridge, and four unknown officers. (*Id.*) Maloney and Wayne Thomis of the *Tribune* also testified, as did Ralph Sharp of the *New York Daily News* and Frank Waldrop of the *Washington Times-Herald*. (*Id.*) On August 19, 1942, the grand jury declined to issue any indictments. (*Id.*) The *Tribune* proclaimed this decision as a victory for the First Amendment, and the following day ran a front-page story that included a depiction of the Tribune Tower as a citadel for press freedom. (R. 1, Pet. at 4.) The *Tribune* investigation marks the first and only time in U.S. history that the federal government attempted to prosecute a major newspaper for an alleged violation of the Espionage Act. (*Id.* at 5.)

On November 18, 2014, Petitioners filed the Petition requesting that the Court unseal the transcripts of witness testimony given during the grand jury investigation of the *Tribune*. (R. 1, Pet.) Carlson is in the process of writing a book to be published by the Naval Institute Press

---

[1] The Espionage Act prohibits, among other things, the disclosure of classified information that has been limited or restricted by the federal government for national security reasons. *See* 18 U.S.C. § 798.

2

concerning the *Tribune* scandal. (R. 4-1, Carlson Decl. ¶ 3.) In researching his book, he has spent the past two years conducting extensive research of newspaper archives, presidential libraries, and other repositories of historical information. (*Id.* ¶ 5.) He has also filed several Freedom of Information Act ("FOIA") requests, and as a result has received extensive information related to the government's investigation of the *Tribune*, including 2,500 pages of DOJ materials and 1,000 pages of Federal Bureau of Investigation ("FBI") records. (*Id.* ¶ 6.) These files include summaries of interviews of Navy personnel conducted by government investigators, transcripts of DOJ interviews with Johnston and Malone, and correspondence between the Navy, DOJ, FBI, and *Tribune* staff members. (*Id.* ¶¶ 6-7.) These records, however, did not include the transcripts of the witnesses' testimony before the grand jury. (*Id.*) At present, the transcripts remain under seal at a National Archives and Records Administration ("NARA") facility in College Park, Maryland.[2] (*Id.* ¶ 9.)

Carlson and a coalition of historical organizations now seek to have the transcripts released. (R. 4, Pet'rs' Mem. at 2-3.) They argue that the public has a compelling interest in the release of this information because of the historical significance of the *Tribune* investigation. (*Id.* at 3-4.) The government opposes Petitioners' request, and argues that "historical significance" is not a permitted reason for disclosing grand jury transcripts under the Federal Rules of Criminal Procedure. (R. 11, Gov't's Opp'n at 7.) In reply, Petitioners argue that this Court has inherent authority to order disclosure of grand jury transcripts in special circumstances, and that it is appropriate to do so in this case. (R. 13, Pet'rs' Reply at 1-2.)

---

[2] As a general matter, a petition for disclosure of grand jury materials is to be filed "in the district where the grand jury convened." Fed. R. Crim. P. 6(e)(3)(F).

3

## LEGAL STANDARD

Article III of the U.S. Constitution provides: "The judicial Power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III § 1. It has long been recognized that federal courts are vested with certain inherent authority in the exercise of their duties. *See Degen v. United States*, 517 U.S. 820, 823 (1996) ("Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities."); *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980) ("The inherent powers of federal courts are those which 'are necessary to the exercise of all others.'" (citation omitted)). "These powers are 'governed not by rule or statute but by the control necessarily vested in the courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631 (1962)). Thus, federal courts may, in certain circumstances, "formulate procedural rules not specifically required by the Constitution or the Congress." *United States v. Hasting*, 461 U.S. 499, 505 (1983).

The scope of this inherent authority, however, is not without limits. "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44; *see also Degen*, 517 U.S. at 823 ("The extent of these powers must be delimited with care, for there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority."). In particular, courts are not permitted to exercise their inherent authority to create new laws or invalidate existing laws, as "courts can only interpret congressional acts. They cannot legislate." *De Soto Sec. Co. v. Comm'n of Internal Revenue*, 235 F.2d 409, 411 (7th Cir. 1956); *see also*

*Bank of Novia Scotia v. United States*, 487 U.S. 250, 254 (1988) ("It is well established that 'even a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions.'" (citation omitted)). Any other interpretation "would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing." *United States v. Payner*, 447 U.S. 727, 737 (1980).

## ANALYSIS

### I. Whether the Court has Authority to Release the Transcripts

There is a long-standing tradition in the United States, "older than our Nation itself," that grand jury proceedings are to be kept secret. *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959). The Supreme Court has outlined several reasons for maintaining grand jury secrecy:

> (1) to prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; and (5) to protect the innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 219 n.10 (1979) (citation omitted). Because of these considerations, "courts have been reluctant to lift unnecessarily the veil of secrecy from the grand jury." *Id.* at 219.

Yet the rule of grand jury secrecy is not absolute. For instance, the secrecy requirement does not apply to grand jury witnesses, who are permitted to publicly disclose the questions they were asked and the answers they gave. *See* Fed. R. Crim. P. 6(e)(2) (providing that "[n]o obligation of secrecy may be imposed on any person" other than grand jurors, interpreters,

operators of recording devices and transcribers, and government personnel); *see also Worrell Newspapers of Ind., Inc. v. Westhafer*, 739 F.2d 1219, 1223 (7th Cir. 1984) ("[T]he secrecy provision in Rule 6(e) applies, by its terms, only to individuals who are privy to the information contained in a sealed document by virtue of their positions in the criminal justice system.").

Similarly, Federal Rule of Criminal Procedure 6(e) addresses several situations in which the Court can order the release of grand jury materials. That Rule provides:

> The court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand jury matter:
>
> (i) preliminarily to or in connection with a judicial proceeding;
>
> (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury;
>
> (iii) at the request of the government, when sought by a foreign court or prosecutor for use in an official criminal investigation;
>
> (iv) at the request of the government if it shows that the matter may disclose a violation of State, Indian tribal, or foreign criminal law, as long as the disclosure is to an appropriate state, state-subdivision, Indian tribal, or foreign government official for the purpose of enforcing that law; or
>
> (v) at the request of the government if it shows that the matter may disclose a violation of military criminal law under the Uniform Code of Military Justice, as long as the disclosure is to an appropriate military official for the purpose of enforcing that law.

Fed. R. Crim. P. 6(e)(3)(E).

The parties are in agreement that none of the exceptions contained in Rule 6(e) directly apply in the present case. (R. 11, Gov't's Opp'n at 10; R. 4, Pet'rs' Mem. at 4 n.3.) The source of their disagreement is over whether this Court has authority to order release of grand jury materials for reasons other than those enumerated in Rule 6(e). (*See* R. 4, Pet'rs' Mem. at 3-9; R. 11, Gov't's Opp'n at 15-23.) Petitioners argue that this Court has inherent authority to release

grand jury transcripts for reasons other than those specified in Rule 6(e), including historical significance. (R. 4, Pet'rs' Mem. at 3-9; R. 13, Pet'rs' Reply at 3-11.) The government counters that this Court has no such authority. (R. 11, Gov't's Opp'n at 9-31.) In the government's view, Supreme Court jurisprudence does not permit any non-textual exceptions to Rule 6(e). (*Id.* at 21-25.) If the government is correct that Supreme Court precedent precludes the Court from granting Petitioners' request, this would necessarily end the Court's analysis. Accordingly, the Court begins there.

In support of its argument, the government cites to *United States v. Baggot*, 463 U.S. 476 (1983), in which the Supreme Court held that a district court was not authorized to release records from a grand jury investigation related to certain commodity futures transactions. (*See* R. 11, Gov't Opp'n at 21.) In that case, the government sought disclosure of the records so that the Internal Revenue Service ("IRS") could conduct an audit to determine whether the target of the investigation was subject to civil income tax liabilities. *Baggot*, 463 U.S. at 477-78. The district court concluded that a civil tax audit did not fall within the "in connection with a judicial proceeding" exception set forth in Rule 6(e)(3)(E)(i), but nevertheless ordered release of the records under its "general supervisory powers over the grand jury." *Id.* at 478. The U.S. Court of Appeals for the Seventh Circuit reversed, and the government appealed, seeking certiorari solely on the issue of whether a civil tax audit constitutes a "judicial proceeding" under Rule 6(e)(3)(E)(i). *Id.*

In affirming the Seventh Circuit's decision, the Supreme Court held that an IRS civil tax audit is not a "judicial proceeding" as defined by Rule 6(e). *Id.* at 482-83. The Supreme Court was not called to decide, nor did it otherwise address, whether a district court has inherent authority to disclose grand jury materials in situations other than those enumerated in Rule 6(e).

7

*See id.* at 478. The government concedes as much here when it acknowledges: "[A]lthough it came close in *Baggot*, the Supreme Court has not yet squarely addressed whether a district court's authority to disclose grand jury materials is cabined by Rule 6(e)." (R. 11, Gov't's Opp'n at 21.) Instead, the sole issue in *Baggot* was the interpretation of a particular provision of Rule 6(e). *See Baggot*, 463 U.S. at 478. Therefore, the Court does not find *Baggot* dispositive.

The government additionally relies on *Carlisle v. United States*, 517 U.S. 416 (1996), and *Bank of Nova Scotia*, 487 U.S. at 253-55, in support of its argument. (R. 11, Gov't Opp'n at 21-25.) In *Carlisle*, the Supreme Court addressed whether a court could use its inherent authority to permit the untimely filing of a motion for acquittal under Federal Rule of Criminal Procedure 29. *Carlisle*, 517 U.S. at 417-18. In that case, the defendant filed a motion for a judgment of acquittal under Rule 29, but failed to meet the time deadline contained in Rule 29(c). *Id.* The district court nevertheless permitted the untimely filing in an exercise of discretion, and then granted the motion for acquittal. *Id.* at 419-20. The Sixth Circuit Court of Appeals reversed the district court's ruling, and the Supreme Court affirmed. *Id.* at 418. The Supreme Court observed that although Federal Rule of Criminal Procedure 45(b) generally permitted extensions of deadlines based on excusable neglect, that Rule expressly provided that that "the court may not extend the time for taking any action under Rule 29." *Id.* at 420. Thus, the Supreme Court held, the district court could not use its inherent authority to grant an extension outside the deadline contained in Rule 29, as such action violated the express provisions of the Federal Rules. *Id.* at 424-26. In other words, courts cannot use their inherent authority to construe the Federal Rules of Criminal Procedure "to mean something other than what they plainly say[.]" *Id.* at 424.

Similarly, in *Bank of Nova Scotia*, the district court dismissed charges against a criminal defendant based on prosecutorial misconduct in connection with a grand jury proceeding, even

8

though there had been no prejudice to the defendants. *Bank of Nova Scotia*, 487 U.S. at 253-54. The Supreme Court held that this was not a proper exercise of the court's inherent authority over grand juries, given the prescription in Federal Rule of Criminal Procedure 52 that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *Id.* at 255 (quoting Fed. R. Crim. P. 52(a)). The Supreme Court held that the district court could not use its inherent authority to "circumvent" the harmless error standard contained in Rule 52(a), because "federal courts have no more discretion to disregard the Rule's mandate than they do to disregard constitutional or statutory provisions." *Id.* at 254-55.

As this Court reads them, *Carlisle* and *Bank of Nova Scotia* stand for the unremarkable and long-standing principle that a federal court cannot exercise its inherent authority in a manner that conflicts with the express provisions of the Federal Rules. *See Carlisle*, 517 U.S. at 426 ("Whatever the scope of this 'inherent power' . . . it does not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure."). In this case, unlike in *Carlisle* or *Bank of Nova Scotia*, nothing in the Federal Rules expressly *forbids* a district court from releasing grand jury materials based on their historical significance; the Rules simply do not expressly authorize it. This distinction is critical. As the Seventh Circuit has recognized, the "mere absence of language in the federal rules specifically authorizing or describing a particular judicial procedure should not, and does not, give rise to a negative implication of prohibition." *See G Heilman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 652 (7th Cir. 1989) (citing *Link v. Wabash R.R.*, 370 U.S. 626, 629-30 (1989).) The Federal Rules specifically provide that, in the absence of express authority to the contrary, the Court can proceed "in any manner consistent with federal law, these Rules, and the local rules of the district." Fed. R. Crim. P. 57(b). Therefore, the Court disagrees with the government's contention that Supreme Court case law

precludes the disclosure of grand jury testimony for reasons other than those enumerated in Rule 6(e).³

The government additionally argues that the maxim *espressio unius est exclusio alterius* precludes the Court from interpreting Rule 6(e) to allow disclosure for reasons other than those specified. (R. 11, Gov't's Opp'n at 11-12.) This canon of construction, meaning "the expression of one thing suggests the exclusion of others," has fallen upon somewhat "disfavored status." *Dahlstrom v. Sun-Times Media, L.L.C.*, 777 F.3d 937, 943 (7th Cir. 2015); *see also Exelon Generation Co., L.L.C. v. Local 15, Intern. Broth. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 571 (7th Cir. 2012) (referring to the maxim as "much-derided"). As the Seventh Circuit has explained, "one might chant the words *espressio unius est exclusio alterius*, but this maxim never answers the question whether the statutory list is designed as a floor or a ceiling." *Ivey v. Harney*, 47 F.3d 181, 183 (7th Cir. 1995). In addition, the Supreme Court has "repeatedly" held that the canon "does not apply to every statutory list or grouping[.]" *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). Rather, the canon "has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Id.* (citation omitted). In other words, the canon should be applied only if "it is fair to suppose that Congress considered the unnamed possibility and intended to say no to it." *Id.*

---

³ The government also cites to *United States v. Williams*, 504 U.S. 36 (1992), in support of its argument, (*see* R. 11, Gov't's Opposition at 15), but that case merely reaffirmed the principle that grand juries operate separately from the Judiciary; the Supreme Court held that a trial judge's authority over grand juries does not permit "judicial reshaping of the grand jury institution, [or] substantially altering the traditional relationships between the prosecutor, the constituting court, and the grand jury itself." *Id.* at 50. That is not remotely what Petitioners are requesting here.

10

As drafted, Rule 6(e) does not contain the type of negative language—such as "only" or "limited to"—that one would expect to find if the list were intended to be exclusive. *See* Fed R. Crim. P. 6(e)(3)(E). Nor are the exceptions listed in Rule 6(e) part of an "associated group or series." *Barnhart*, 537 U.S. at 168. Rather, they describe distinct scenarios in which different individuals can seek disclosure of grand jury materials. *See* Fed. R. Crim. P. 6(e)(3)(E)(i)-(v). Under these circumstances, there is little basis to conclude that Congress intended Rule 6(e)(3) to preclude disclosure of grand jury materials in all situations other than those listed. *See Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) ("Just as statutory language suggesting exclusiveness is missing, so is that essential extrastatutory ingredient of an expression-exclusion demonstration, the series of terms from which an omission bespeaks a negative implication.").

On the other hand, there is considerable support for the conclusion that Rule 6(e) was not intended to cabin the Court's inherent authority. First and foremost, the Court considers the history of Rule 6, which reflects that it was not intended to "ossify" the law as of 1944, when the Rule was enacted; rather, the evolution of Rule 6 suggests that the exceptions contained within it are "subject to development by the courts." *In re Hastings*, 735 F.2d 1261, 1269 (11th Cir. 1984). History shows that "as new exceptions outside of those enumerated in Rule 6(e) have gained traction among the courts, the scope of the rule has followed suit[.]" *In re Kutler*, 800 F. Supp. 2d 42, 45 (D.D.C. 2011). For instance, in 1971, a district court went beyond the express language of Rule 6(e)—which at that time permitted disclosure of grand jury materials only to government attorneys—to permit disclosure to government employees who were not attorneys. *See In re William H. Pflaumer & Sons, Inc.*, 53 F.R.D. 464, 476-77 (E.D. Pa. 1971). Thereafter, Rule 6(e) was amended to include a provision for releasing grand jury materials to government personnel who were assisting government attorneys in the performance of their duties. *See* Fed.

11

R. Crim. P. 6(e)(3)(A)(ii), Advisory Committee Notes to 1977 Amendments. Similarly, in 1979, the requirement that grand jury proceedings be recorded was added to Rule 6(e) in response to the trend among courts to require such recordings. *See* Fed. R. Crim. P. 6(e)(1), Advisory Committee Note to 1979 Amendments. This history suggests that the "exceptions to the secrecy rule generally have developed through conformance of Rule 6 to the 'developments wrought in decision of the federal courts,' not *vice versa*." *In re Am. Historical Ass'n*, 49 F. Supp. 2d 274, 285 (S.D.N.Y. May 13, 1999) (quoting *Hastings*, 735 F.2d at 1268)).

The Court also considers that the Federal Advisory Committee on the Criminal Rules, a rulemaking body under the jurisdiction of the Judicial Conference Committee on Rules of Practice and Procedure, has interpreted Rule 6(e) in a manner supporting the view that courts have inherent authority to release grand jury materials for reasons outside of those enumerated. In June 2012, the Committee rejected a proposal by the DOJ to amend Rule 6(e) to establish an exception allowing disclosure of grand jury materials on grounds of their historical significance if certain conditions are satisfied. *See* Judicial Conference Committee on Rules of Practice and Procedure, Minutes of Meeting June 11-12, 2012, at 44. In reaching its decision, the Committee considered the history of Rule 6(e), the relationship between the courts and grand juries, and the case law pertaining to a federal court's inherent authority. *Id.* Ultimately, the Committee concluded that "there is no need for a rule on the subject." *Id.* In the Committee's view, "in the rare cases where disclosure of historic materials had been sought, the district judges acted

reasonably in referring to their inherent authority."[4] *Id.* Although not dispositive, the Committee's interpretation of Rule 6(e) is entitled to this Court's "respectful consideration." *United States v. Dawson*, 434 F.3d 956, 958 (7th Cir. 2006).

In addition, although the Seventh Circuit has not yet decided this precise issue, it previously observed in dicta: "We may not always be bound by a strict and literal interpretation of Rule 6(e) in the situation where there is some extraordinary and compelling need for disclosure in the interest of justice, and little traditional need for secrecy remains." *In re Special Feb., 1975 Grand Jury*, 662 F.2d 1232, 1236 (7th Cir. 1981), *aff'd on other grounds sub nom. Baggot*, 463 U.S. at 483. In a later case, the Seventh Circuit again appeared to recognize the possibility, though rare, of situations in which grand jury materials could be disclosed for reasons other than those specified in Rule 6(e). *See United States v. Corbitt*, 879 F.2d 224, 239 n.18 (7th Cir. 1989) ("it is clear that disclosure of grand jury materials in situations not governed by Rule 6(e) should be an uncommon occurrence").

In keeping with this principle, numerous other federal courts have concluded that courts have inherent authority to disclose grand jury materials for reasons other than those specified in Rule 6(e), including where the materials have historical significance. *See, e.g., In re Craig*, 131 F.3d 99, 102 (2d Cir. 1997) ("this court has recognized that there are certain 'special

---

[4] The government argues that the Committee's action actually supports its position, (*see* R. 11, Gov't's Opposition at 24-25), because the Committee chair noted during their discussions that "[a] change of that magnitude... would have to be accomplished through legislation, rather than a rule change," Judicial Conference Committee on Rules of Practice of Procedure, Minutes of Meeting June 11-12, 2012, at 44. However, the Committee chair was referring to the DOJ's proposal that grand jury records be open to the public *as a matter of course* after the passage of a certain number of years. *See id.* ("[I]t would be a radical change to go from a presumption of absolute secrecy, which is how grand juries have always operated, to a presumption that grand jury materials should be presumed open after a certain number of years."). That is distinct from what Petitioners are advocating here—that the Court may exercise its discretion to release grand jury transcripts in appropriate circumstances.

13

circumstances' in which release of grand jury records is appropriate even outside of the boundaries of the rule"); *In re Hastings*, 735 F.2d 1261, 1272 (11th Cir. 1984) ("[A] district court may act outside the strict bounds of Rule 6(e), in reliance upon its historic supervisory power."); *In re Nichter*, 949 F. Supp. 2d 205, 213 n.12 (D.D.C. 2013) ("[T]he Court believes that it does, indeed, have the authority to look outside Rule 6(e)" to order release of historically significant grand jury transcripts in appropriate cases); *Historical Ass'n*, 49 F. Supp. 2d at 285 ("[A] district court's ability to order release of grand jury materials has never been confined only to the secrecy rule specifically enumerated in Rule 6(e)."); *see also In re Special Grand Jury 89-2*, 450 F.3d 1159, 1178 (10th Cir. 2006) (observing in dicta that there was "substantial support for Appellants' position . . . that 'a court's power to order disclosure of grand jury records is not strictly confined to instances spelled out in Rule 6(e)'" (citation omitted)); *In re Grand Jury Proceedings*, 417 F.3d 18, 26 (1st Cir. 2005) ("[Rule 6(e)'s] phrasing can, and should, accommodate rare exceptions premised on inherent judicial power").

The Court now joins these courts in concluding that in appropriate circumstances, federal courts possess inherent authority to release grand jury materials for reasons other than those contained in Rule 6(e).

## II. The Appropriate Standard for Disclosing Grand Jury Transcripts

The Court must next consider what criteria to use in evaluating Petitioners' request for release of the transcripts in this case. The Court is cognizant that "whether to make public the ordinarily secret proceedings of a grand jury investigation is one of the broadest and most sensitive exercises of careful judgment that a trial judge can make." *Craig*, 131 F.3d at 104. Although the Seventh Circuit has not addressed this precise issue, the Second Circuit has developed a leading framework for deciding whether to release grand jury transcripts based on

their historical significance. *See Craig*, 131 F.3d at 106. The Circuit observed that there is no "talismanic formula or rigid set of prerequisites" for deciding whether to release transcripts on this ground. *Id.* Instead, it identified nine non-exhaustive factors for courts to consider: (1) the identity of the party seeking disclosure; (2) whether the government or the defendant in the grand jury proceeding objects to disclosure; (3) why disclosure is being sought in a particular case; (4) what specific information is being sought; (5) how long ago the grand jury proceeding took place; (6) the current status of the principals and their families; (7) the extent to which the material has been previously made public; (8) whether witnesses to the grand jury proceedings who might be affected by the disclosure are still alive; and (9) any additional need for maintaining secrecy in a particular case. *Id.* at 106.

The *Craig* factors have been applied by numerous district courts when deciding whether to release grand jury materials based on their historical significance. *See, e.g., In re Kutler*, 800 F. Supp. 2d 42, 47-50 (D.D.C. 2011); *Historical Ass'n*, 49 F. Supp.2d at 291-97; *In re Nat'l Sec. Archive*, No. 08-civ-6599, 2008 WL 8985358, at *1 (S.D.N.Y. Aug. 26, 2008); *In re Tabac*, No. 3:08-mc-0243, 2009 WL 5213717, at *1-*2 (M.D. Tenn. Apr. 14, 2009). Like those courts, this Court finds the *Craig* framework to be a reasonable approach, as it incorporates flexibility and a nuanced consideration of a variety of factual matters to guide the Court's exercise of discretion. Accordingly, the Court will apply the *Craig* factors in this case.

As to the first factor, the parties seeking disclosure consist of an author/historian and a coalition of historical groups. (*See* R. 1, Pet. at 2-3.) This militates in favor of disclosure. *See Kutler*, 800 F. Supp. 2d at 48 (concluding that first factor weighed in favor of releasing transcripts, where petitioners consisted of scholars and "major historical groups"). Second, although the government opposes the disclosure, it has not identified any specific reason that

releasing the grand jury transcripts will threaten national security or otherwise cause harm. *See Historical Ass'n*, 49 F. Supp. 2d at 291 (second factor weighed in favor of disclosure where the government offered only "generic objections" to disclosure rather than advancing specific concerns about security or privacy). Instead, the government's opposition rests on its belief that this Court lacks authority to disclose the transcripts—an argument the Court has already rejected. (*See* R. 11, Gov't Opp'n at 9-31.) Accordingly, this second factor also weighs in favor of Petitioners.

The third and fourth factors—the reasons for seeking disclosure and the specific information sought—also favor Petitioners. Petitioners seek the transcripts for scholarly purposes and to create a more complete public record of the *Tribune* investigation, which are worthy goals. *See Historical Ass'n*, 49 F. Supp. 2d at 295 ("The public must acquire, at an appropriate time, a significant, if not compelling, interest in ensuring the pages of history are based upon the fullest possible record."). The *Tribune* investigation not only received media coverage at the time it occurred, but has continued to receive media attention in recent years. *See, e.g.*, Carey Shenkman, *70 Years Later, Still Playing Politics With Freedom of the Press*, Huffington Post (Jun. 18, 2014) (available at http://www.huffingtonpost.com/carey-shenkman/freedom-of-the-press_b_5503196.html); Peter Duffy, *Keeping Secrets: How Censorship Has (And Hasn't) Changed Since World War II*, Columbia Journalism Review, Sept/Oct. 2010, at 58. Among other matters, historians continue to debate how Johnston obtained information about the Navy's code-breaking, what the *Tribune* hoped to accomplish by publishing the story, and what the government hoped to accomplish by pursuing the investigation. (*See* R. 1, Pet. at 4-5; R. 4-1, Carlson Decl ¶ 24; R. 4-3, Prados Decl. ¶¶ 6-8.) This decades-long interest in the case suggests that the public has a significant interest in

disclosure of the transcripts. *See Craig*, 131 F.3d at 107 ("[I]f historical interest in a specific case has persisted over a number of years, that serves as an important indication that the public's interest in release of the information is substantial.").

The Court also considers that the *Tribune* investigation implicates broader principles, namely, the relationship between the government and the press in a democratic society, particularly as to matters impacting national security. Even now, there is a robust public debate surrounding the government's prosecution of members of the press for violations of the Espionage Act. *See, e.g.*, Trevor Timm, *Guilty Plea In Fox News Leak Case Shows Why Espionage Act Prosecutions Are Inherently Unfair to Sources*, Freedom of the Press Foundation (Feb. 7, 2014) (available at https://freedom.press/blog/2014/02/guilty-plea-fox-news-leak-case-shows-why-espionage-act-prosecutions-are-inherently); Leonard Downie, *Obama's War On Leaks Undermines Investigative Journalism*, Washington Post (May 23, 2013) (available at http://www.washingtonpost.com/opinions/leonard-downie-obamas-war-on-leaks-undermines-investigative-journalism); Michael Barone, *More Than All Past Presidents, Obama Uses 1917 Espionage Act To Go After Reporters*, Washington Examiner (May 25, 2013) (available at http://www.washingtonexaminer.com/michael-barone-more-than-all-past-presidents-obama-uses-1917-espionage-act-to-go-after-reporters/article/2530340). Other courts have permitted disclosure of grand jury materials where the petitioners sought to explore similarly important events and themes. *See Historical Ass'n*, 49 F. Supp. 2d at 295 (finding disclosure of grand jury testimony pertaining to Alger Hiss, a high-ranking State Department official accused of espionage, of historical importance in light of the "vigorous and sustained debate not only about the case itself, but also about broader issues concerning fundamental and, at times, countervailing aspects of our democracy"); *In re Pet. of Nat'l Sec. Archive*, 2008 WL 8985358,

17

at *1 (finding that "substantial historical importance" justified the disclosure of grand jury records relating to Julius and Ethel Rosenberg and other American citizens accused of espionage during the Cold War). Accordingly, the third and fourth factors also favor Petitioners.

The fifth factor—how long ago the grand jury proceeding took place—also weighs in favor of disclosure. The *Tribune* investigation took place more than 70 years ago, and other courts have released grand jury transcripts based on historical significance when less time has passed. *See In re Kutler*, 800 F. Supp. 2d at 49 (disclosing transcripts from 36 years earlier based on their historical significance); *Historical Ass'n*, 49 F. Supp. 2d at 291 (disclosing transcripts from 50 years earlier based on their historical significance). As these courts have recognized, after so many years the traditional reasons for maintaining grand jury secrecy have typically dissipated. *See Craig*, 131 F.3d at 107 ("[T]he passage of time erodes many of the justifications for continued secrecy."); *Historical Ass'n*, 49 F. Supp. 2d at 292 (observing that the primary reasons for maintaining secrecy "dissolved" some 50 years earlier when the grand jury investigation ended). The age of the transcripts therefore weighs in favor of disclosure.

The sixth and eighth factors—the impact that disclosure might have on the principals, witnesses, or their families—appears to be a minimal concern in this case. Petitioners assert, without contradiction by the government, that most of the parties involved in the investigation passed away more than 40 years ago, and that the last confirmed death of a known grand jury witness occurred in 1997, when Waldrop died at the age of 92. (R. 4-1, Carlson Decl. ¶ 26). Although Petitioners cannot confirm whether the unidentified naval officers are still alive, it is reasonable to infer that that they are not, given that they would now likely be more than 100 years old. (*See* R. 4, Pet'rs' Mem. at 12 n.4.) The Court also considers that the Petition has been pending since November 2014, and to date no witnesses, family members, or other third parties

18

have come forward to express concerns about the transcripts being made public.[5] *See Nat'l Security Archive*, 2008 WL 8985358, at *1 (because of the "ease and efficiency of expressing any objection," witnesses who failed to come forward to object to release of grand jury transcripts were presumed to be either "indifferent to release, or lack[ing] capacity (because of death or otherwise)"). These factors also weigh in favor of release.

The seventh factor—the extent to which the grand jury materials have been made public—also favors Petitioners. As outlined above, a substantial amount of material from the *Tribune* investigation has already been released by the government, including summaries of DOJ interviews with grand jury witnesses Johnston and Maloney, and an internal memorandum by government attorney outlining the government's view of the case and the reasons why a prosecution should not be pursued. (*See* R. 4, Pet'rs' Mem. at 14; R. 4-1, Carlson Decl. ¶ 7; R. 11, Gov't's Opp'n, Ex. A, Mitchell Mem.) The fact that these sensitive materials have already been disclosed suggests that the need for continued secrecy has eroded. *See Craig*, 131 F.3d at 107 ("[E]ven partial previous disclosure often undercuts many of the reasons for secrecy."). Thus, this factor weighs in favor of disclosure.

The final factor requires the Court to consider any additional reasons for maintaining secrecy that exist in the case. *Craig*, 131 F.3d at 106. As noted, the government has not identified any national security concerns or other reason why disclosure would be harmful, nor can this Court discern any reason why the transcripts should be kept from the public at this point. *See Douglas Oil*, 441 U.S. at 223 ("[A]s the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing

---

[5] The Court notes that the filing of the Petition received media coverage in the *Tribune* several months ago. *See* Editorial Board, *Breaking The Code On A Chicago Mystery From WWII*, Chicago Tribune, Nov. 21, 2014.

19

justification."). The grand jury proceedings ended more than 70 years ago, and most of the parties involved have died. No one other than the government has come forward to object to the disclosure, and many of the details related to the *Tribune* scandal have already been made public. Accordingly, the Court finds that release of the transcripts is warranted. Disclosing the transcripts will not only result in a more complete public record of this historic event, but will "in the long run, build confidence in our government by affirming that it is open, in all respects, to scrutiny by the people." *Historical Ass'n*, 49 F. Supp. 2d at 295.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Petition (R. 1) and orders the release of the grand jury transcripts from the 1942 investigation of the *Chicago Tribune*.

ENTERED: *[signature]*
**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: June 10, 2015**

20